**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALLIANCE FOR THE WILD ROCKIES,
*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; UNITED STATES
ANIMAL AND PLANT HEALTH
INSPECTION SERVICE, an agency of
the US Department of Agriculture;
UNITED STATES FOREST SERVICE, an
agency of the US Department of
Agriculture; LESLIE WELDON, in her
official capacity as Regional Forester
of Region One of the US Forest
Service; UNITED STATES
DEPARTMENT OF INTERIOR; UNITED
STATES FISH AND WILDLIFE
SERVICE, an agency of the US
Department of Interior; UNITED
STATES NATIONAL PARK SERVICE,
an agency of the US Department of
Interior; CHRISTIAN MACKAY, in his
official capacity as Executive
Director of the State of Montana
Department of Livestock,
      *Defendants-Appellees*,

and

No. 13-35253

D.C. No.
9:11-cv-00076-
CCL

OPINION

BILL MYERS,
    *Intervenor-Defendant-Appellee.*

Appeal from the United States District Court
for the District of Montana
Charles C. Lovell, Senior District Judge, Presiding

Argued and Submitted
November 8, 2013—Seattle, Washington

File November 20, 2014

Before: Mary M. Schroeder, Richard A. Paez, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Paez

## SUMMARY*

### Environmental Law / Standing / Mootness

The panel affirmed in part and reversed in part the district court's judgment in favor of federal and Montana state agencies and officials in an action brought by Alliance for the Wild Rockies, challenging the decision to permit recurring,

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

low altitude helicopter flights to haze bison in the Yellowstone Grizzly Bear Recovery Zone.

To minimize disease transfer between wild bison and cattle in the Greater Yellowstone Area, the bison are managed, in part, according to an Interagency Bison Management Plan which includes using hazing operations to move the bison. The Yellowstone grizzly bear also inhabits the same area, and is listed as a threatened species under the Endangered Species Act. Under Section 7 of the ESA, the National Park Service prepared biological evaluations for the management plan which were approved by the United States Fish and Wildlife Service, and concluded that the helicopter hazing operations would not adversely affect the Yellowstone grizzly. Section 9 of the ESA prohibits the "taking" – which can include harassing – of an endangered or threatened species.

The panel reversed the district court's holding that Alliance lacked standing to bring its ESA and National Environmental Policy Act claims. The panel also reversed the district court's ruling that Alliance failed to comply with the ESA citizen suit 60-day notice provision. The panel affirmed the dismissal of all of Alliance's ESA claims against the United States Animal and Plant Health Inspection Service and Fish and Wildlife Service because they were not included in the 60-day notice on which Alliance relied.

The panel held that Alliance's ESA Section 7 claim was moot because the federal defendants had already completed a second biological evaluation consultation addressing the impact of helicopter hazing on the Yellowstone grizzly bears, and affirmed the district court's grant of summary judgment to the federal defendants and grant of dismissal to Montana

on the claim.  The panel also affirmed the district court's grant of summary judgment to the federal defendants and grant of dismissal to Montana on Alliance's ESA Section 9 claim because no genuine issues of material fact existed in the record concerning whether a take of a Yellowstone grizzly bear had occurred or was likely to occur.  Finally, the panel affirmed the grant of summary judgment to the federal defendants on the NEPA and National Forest Management Act claims.

---

**COUNSEL**

Rebecca K. Smith (argued), Public Interest Defense Center, PC, Timothy M. Bechtold, Bechtold Law Firm, PLLC; Missoula,  Montana, for Plaintiff-Appellant Alliance for the Wild Rockies.

Thekla Hansen-Young (argued), Trial Attorney, Robert G. Dreher, Acting Assistant Attorney General, Andrew C. Mergen, Trial Attorney, Robert J. Lundman, Trial Attorney; Environment & Natural Resources Division, United States Department of Justice; Washington D.C., for Defendants-Appellees United States Department of Agriculture, United States Animal and Plant Health Inspection service, Leslie Weldon in her official capacity as Regional Forester of Region One of the United States Forest Service, United States Department of the Interior, United States Fish and Wildlife Service, and United States National Park Service.

Robert Stutz, Assistant Attorney General, Agency Legal Service Bureau, Montana Department of Justice; Helena, Montana, for Defendants-Appellees Montana Department of Livestock and Christian Mackay.

John E. Bloomquist and Rachel A. Kinkie, Doney Crowley Payne Bloomquist, P.C., Helena, Montana, for Intervenor-Defendant-Appellee Bill Myers.

---

**OPINION**

PAEZ, Circuit Judge:

The grizzly bear is one of this country's most majestic creatures. Originally numerous throughout the American west, including California and Texas, grizzly bear populations were decimated in the nineteenth and twentieth centuries through a combination of commercial trapping, unregulated hunting and rapid habitat deterioration. Between 1800 and 1975, grizzly bear populations fell from estimates of over 50,000 to less than 1,000.[1] Today, they are present only in Washington, Idaho, Montana and Wyoming.

One sub-population of grizzly bear, central to the present case, is the Yellowstone grizzly bear, which is protected under the Endangered Species Act and monitored as part of the Yellowstone Grizzly Bear Recovery Zone. The Yellowstone grizzly bear shares its habitat with a variety of other species, including the Yellowstone bison, which migrates seasonally inside and outside of Yellowstone National Park. Because the Yellowstone bison carries brucellosis, a disease deadly to cattle, their migration patterns are controlled through carefully selected "'hazing, or

---

[1] *See* Christopher Servheen, *Grizzly Bear Recovery Plan*, United States Fish and Wildlife Service, 9 (Sept. 10 1993), http://www.fws.gov/mountain-prairie/species/mammals/grizzly/Grizzly_bear_recovery_plan.pdf.

herding," methods.    Although these hazing methods
effectively limit encounters between Yellowstone bison and
cattle, environmental groups have become increasingly
concerned about the possibility for detrimental consequences
to the precarious maintenance of the Yellowstone grizzly bear
population.  It is these concerns that are at issue in this case.

Alliance for the Wild Rockies ("Alliance") challenges the
decision of the United States Forest Service ("Forest
Service"), United States National Park Service ("Park
Service"), United States Department of Agriculture
("USDA"), United States Animal and Plant Health Inspection
Service ("Inspection Service"), United States Department of
the Interior ("Interior"), and United States Fish and Wildlife
Service ("FWS") (collectively, "federal defendants"), as well
as the Montana Department of Livestock ("MDOL"), to
permit recurring, low-altitude helicopter flights to haze bison
in the Yellowstone Grizzly Bear Recovery Zone.  Alliance
alleges that these helicopter flights may harass Yellowstone
grizzly bears and constitute an unpermitted "'take,' as defined
by statute."  Alliance alleges that the federal defendants and
MDOL have violated the Endangered Species Act of 1973
("ESA"), 16 U.S.C. §§ 1531 *et seq.*, the National
Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C.
§§ 4321 *et seq.*, and the National Forest Management Act of
1976 ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, because they
have failed to undertake the proper procedures for
reevaluating the effect of helicopter hazing on Yellowstone
grizzly bears and have not issued an incidental take permit for
the alleged harassment of Yellowstone grizzly bears.

Before turning to the merits of Alliance's claims, we must
first address the district court's ruling that Alliance lacked
Article III standing to pursue its claims and that Alliance

failed to properly give notice of its ESA claims as required by 16 U.S.C. § 1540(g)(2)(A)(i). We also address whether Alliance's Section 7 claim under the ESA is moot.

We affirm in part and reverse in part.

## I.  Background

The Greater Yellowstone Area spans twenty million acres of land across parts of Idaho, Montana and Wyoming, including Yellowstone National Park. It is inhabited by wild bison and Yellowstone grizzly bears, both of which freely migrate in and out of Yellowstone National Park. Some wild bison in the Greater Yellowstone Area have a contagious bacterial disease called brucellosis that can be transmitted to cattle that graze in the region. To minimize disease transfer between bison and cattle, the bison are managed, in part, according to a 2000 interagency document entitled the Interagency Bison Management Plan ("Management Plan"). The Management Plan aims to "maintain a wild, free ranging population of bison and address the risk of brucellosis transmission to protect the economic interest and viability of the livestock industry in the state of Montana." The Management Plan allows bison to leave Yellowstone National Park each winter to forage in lower elevations in Montana's Gallatin National Forest. In the middle of May of each year, MDOL encourages the bison to return to Yellowstone National Park via "hazing" operations. Approved hazing methods include using riders on horseback, off-highway vehicles and helicopters to move the bison out of Montana.

The Park Service, Forest Service, Inspection Service, Interior and USDA all signed and authorized the Record of

Decision implementing the Management Plan.  The State of Montana also signed a separate Record of Decision committing to implementation of the Management Plan.

**A.  Yellowstone Grizzly Bears**

The Yellowstone grizzly bear is a sub-population of grizzly bear, which is listed as a threatened species under the ESA.  50 C.F.R. § 17.11 (2014).  Consistent with their obligations under NEPA, the Park Service, Forest Service and Inspection Service completed a final environmental impact statement ("final EIS") prior to the approval of the Management Plan.  The final EIS analyzed the potential effects of the Management Plan, including possible hazing operations, on Yellowstone grizzly bears in the spring, when they emerge from their dens to feed.  It concluded that the impacts of bison hazing on Yellowstone grizzly bears "would be short term and negligible" because, "[a]lthough there is the possibility of overlap in the fall and spring when the bears are not in dens, during the majority of bison management activities, bears would be in their dens."  The final EIS noted that hazing operations would cease if there was evidence of grizzly bear activity in the hazing area.

In compliance with Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), the Park Service also prepared a Biological Evaluation for the Management Plan, which was approved by the FWS in 2000.  The FWS concurred in the Park Service's finding that the Management Plan was "not likely to adversely affect" Yellowstone grizzly bears, but opined that reinitiation of consultation might be required if new information became available suggesting possible effects on the threatened grizzly bear population.  The central basis for the Biological Evaluation's finding was that hazing activities

would primarily occur while grizzly bears are hibernating. The Biological Evaluation further noted that "[i]f grizzly bears are active in the area, operations at the capture facilities may have to cease."

Following the Management Plan's approval in 2000, helicopter hazing under the plan was gradually extended beyond the original target of a mid-May completion date. In 2010, hazing operations were documented through the end of July, and in 2011, they continued through June. Additionally, both the Forest Service and independent observers reported the presence of Yellowstone grizzly bears prior to and during hazing operations. In 2012, the Park Service acknowledged these changes and announced that:

> Since the [FWS] issued its letter of concurrence in 2000, additional information regarding bison and grizzly bears has become available. Through adaptive management adjustments to the Interagency Bison Management Plan, the hazing of bison now occurs more often from December through June than in the past. The hazing of bison during spring and early summer may affect threatened grizzly bears in a manner or to an extent not considered in the 2000 Biological Assessment.

Shortly thereafter, while this case was pending in the district court, the Park Service reinitiated consultation based on new concerns regarding the impact of cutthroat trout reductions on grizzly bears and the cumulative effects of the extended helicopter hazing operations. The 2012 Biological Evaluation ultimately concluded "that bison hazing activities do not

cause injury, decrease productivity, or significantly interfere with normal behavior patterns of grizzly bears . . . ." The FWS re-concurred with the Park Service's conclusion.

## B. District Court Proceedings

On May 11, 2011, Alliance sent a "60-day Notice of Intent to Sue Under the [ESA]" to the Forest Service, Park Service, MDOL, USDA and Interior.[2] The notice alleged that the federal defendants violated the ESA by failing "to apply the best available science and new information and reinitiate Section 7 ESA consultation," and failing "to comply with ESA Section 9 by allowing/causing past and ongoing unpermitted take of threatened Yellowstone grizzly bears from harassment and harm related to helicopter hazing operations . . . ."

Without waiting for the 60-day notice period to expire, on May 18, 2011, Alliance filed a complaint under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, alleging violations of  NEPA and NFMA, and "challeng[ing] the U.S. Forest Service's 2008 management plan and 2011 annual decision to permit recurring, low-altitude helicopter flights that harass Yellowstone grizzly bears, during spring and summer bear season, over National Forest lands in the Yellowstone Grizzly Bear Recovery Zone." The complaint also stated that Alliance would amend the complaint to include ESA claims after the 60-day notice period had expired.

---

[2] Alliance later filed an amended notice on June 29, 2011, that added FWS and Inspection Service.

On July 14, 2011, Alliance filed an amended complaint alleging claims under Section 7 and Section 9 of the ESA. In Fall 2012, the parties filed cross-motions for summary judgment and, while the motions were pending, the federal defendants notified the district court that, as noted above, they had reinitiated, and completed, Section 7 consultation on the impact of the Management Plan on Yellowstone grizzly bears.

The district court granted the federal defendants' motion for summary judgment in its entirety. The court dismissed Alliance's claims against the federal defendants for lack of Article III standing, holding that the federal defendants did not control, authorize or currently fund the helicopter hazing operations. The court further concluded that Alliance failed to comply with the ESA's 60-day notice requirement and, therefore, jurisdiction over Alliance's ESA claims did not exist. Finally, the court held that the Section 7 claim was moot because the federal defendants had voluntarily reinitiated and completed consultation on the impacts of helicopter hazing under the Management Plan on Yellowstone grizzly bears.

The district court also addressed the merits of Alliance's claims other than its Section 7 claim. The district court granted summary judgment to the federal defendants on Alliance's Section 9 claim on the ground that "there is simply no evidence in this record that [Montana's] helicopter hazing constitutes a 'take' of the Yellowstone grizzly bear within the meaning of ESA Section 9." The district court also granted summary judgment to the federal defendants on Alliance's NEPA claims, finding that the Management Plan's 2000 final EIS adequately analyzed the impacts of helicopter hazing on grizzly bears, and the evidence in the record did not require

preparation of a supplemental EIS. Finally, the court rejected the NFMA claim because Alliance failed to show that the Forest Service violated any provision of the Gallatin National Forest Plan.

Alliance timely appealed.[3]

## II. Standing

As an initial matter, we first address whether Alliance has standing to raise its ESA and NEPA claims. To establish Article III standing, Alliance must show (1) an injury in fact, which is an injury that is concrete and particularized, and actual or imminent; (2) a causal connection between the injury and the conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Whether there is an injury in fact is not contested here. Alliance has alleged, through extensive declarations, that its members have vested "esthetic, recreational, scientific, vocational, and educational interests in the threatened Yellowstone grizzly bears and their occupied habit," and that these interests are threatened by the federal defendants alleged failure to comply with the ESA and NEPA.

Instead, the federal defendants argue that because they did not authorize, control, or currently fund the helicopter hazing operations, "no federal action underlies the complained-of

---

[3] We review de novo the district court's grant of summary judgment. *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011). We also review de novo a district court's ruling on issues of standing and mootness. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011).

activity." They contend they therefore did not cause Alliance's injury in fact and have no ability to redress the alleged harm. Accordingly, they argue, Alliance cannot establish the standing requirements of causation and redressability.

Alliance's response is that the Management Plan was developed and approved by the federal defendants and that the helicopter hazing program was in fact "authorized, funded, or carried out, in whole or in part" by the federal defendants. As Alliance explains it, the "harm is caused by the [federal defendants'] failure to comply with the ESA [and NEPA]; and the remedy is for the Court to order reconsultation and promulgation of an incidental take permit for the [Management Plan]." We hold that the district court erred in dismissing Alliance's ESA and NEPA claims for lack of standing.

**A. ESA**

The ESA requires all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). "Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies . . . ." 50 C.F.R. § 402.02. We have held that "[t]here is 'little doubt' that Congress intended agency action to have a broad definition in the ESA." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc). Consistent with the broad interpretation of "agency action," we have recognized that environmental management plans

constitute federal agency actions under the ESA.  *See Lane Cnty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 293–94 (9th Cir. 1992).

As adoption of the Management Plan was an agency action, the federal defendants are required to abide by certain procedural and substantive requirements imposed under the ESA.  *See* 16 U.S.C. §§ 1536(a)(2), 1538(a)(1)(B).  It is the alleged failure to comply with these requirements that is at the heart of Alliance's injury in fact and at the heart of the relief it seeks in this action.  Although the federal defendants argue that Alliance ultimately seeks a "cessation of helicopter hazing" as a remedy for its injury, and that they have no ability to provide this relief, this argument misconstrues the nature of Alliance's complaint.

Alliance argues that the federal defendants have violated Section 7 of the ESA because "Defendants have failed to provide a Biological Opinion and/or Incidental Take Statement for the adverse impact and take of grizzly bears from repeated low-altitude helicopter flights . . . ," and have "failed to comply with their ongoing obligation to reinitiate ESA consultation for the 2000 management plan . . . ." Similarly, Alliance alleges that the federal defendants and MDOL have violated Section 9 because "Defendants are allowing and causing past and ongoing unpermitted take of threatened Yellowstone grizzly bears" and "do not have an Incidental Take Statement for this take."

There is a direct causal connection between these claims of procedural injury and the federal defendants' actions concerning the Management Plan.  The federal defendants worked jointly with MDOL to develop the Management Plan, and ultimately authorized and approved the Management Plan

after adopting a lengthy Record of Decision.  The Forest Service and Park Service then engaged in the development, and completion, of consultation under Section 7 for the Management Plan and retain ongoing responsibility to reinitiate consultation as required. *See* 50 C.F.R. § 402.16(b). Because the Management Plan governs actions directed at bison in the Greater Yellowstone Area, and those actions have the capacity to affect threatened Yellowstone grizzly bears, the Management Plan and the federal defendants' related ongoing responsibilities constitute agency action sufficient to establish causation for the ESA procedural injuries Alliance alleges.

Further, Alliance's ESA claims are redressable by the federal defendants. Indeed, they have now twice engaged in the precise action that Alliance seeks, consultation under Section 7 of the ESA.  Moreover, we need not determine whether the federal defendants' reinitiation of consultation under Section 7 and issuance of an Incidental Take Statement would ultimately redress Alliance's interest in the protection of Yellowstone grizzly bears.  It is enough that their "procedural right [], if exercised, *could* protect [their] concrete interests."  *Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc) (emphasis in original, internal quotation marks omitted).  Accordingly, Alliance's ESA claims are redressable by the federal defendants, and Alliance has standing to raise these claims.

## B.  NEPA

As with the ESA claims, the federal defendants argue that Alliance lacks Article III standing to pursue its NEPA claim because it cannot show that a federal action underlies the NEPA claim sufficient to establish causation and

redressability. Because the Management Plan is a federal action and Alliance's NEPA claim is a procedural one, we reverse and hold that Alliance has standing to bring its NEPA claim.

As previously discussed, under Article III, Alliance must show that it has suffered an injury in fact that "is fairly traceable" to the federal action of the defendant and "will be redressed by a favorable decision." *See Friends of the Earth v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 180–81 (2000). In addition to these constitutional requirements, prudential standing under NEPA also requires a showing that the alleged injury "falls within the 'zone of interests' that NEPA was designed to protect." *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001). The federal defendants do not dispute that Alliance has established an injury in fact and prudential standing. Accordingly, we consider only whether the necessary causality and redressability exists.

Under NEPA, federal agencies are required to complete an EIS as a component of any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The federal defendants argue that their lack of direct involvement in the helicopter hazing operations authorized by the Management Plan demonstrates that there is no major federal action at stake in this case. This argument again misconstrues the nature of Alliance's claims.

Alliance's claim under NEPA arises from the Management Plan itself. Alliance challenges the federal defendants' "failure to conduct a NEPA analysis to assess the direct, indirect and cumulative environmental effects on threatened Yellowstone grizzly bears of annual recurring low-altitude helicopter flights over occupied grizzly bear habitat."

As the flights were authorized by the Management Plan, this injury is "fairly traceable" to the federal defendants' actions in approving the Management Plan. When viewed in this manner, there can be little doubt that Alliance has alleged a major federal action for purposes of NEPA. *See Cold Mountain v. Garber*, 375 F.3d 884, 887 n.2, 893–94 (9th Cir. 2004) (finding the predecessor to the Management Plan to be a major federal action for purposes of NEPA analysis). The fact that the federal defendants have previously completed a final EIS for the Management Plan belies their claim that there is no federal action. Were the Management Plan not a "major Federal action[] significantly affecting the quality of the human environment," the federal defendants would never have been required to complete an initial final EIS. 42 U.S.C. § 4332(2)(C).

Moreover, as with Alliance's ESA claims, the procedural injury Alliance alleges under NEPA is also redressable by the federal defendants. Here, Alliance seeks supplementation of the EIS to consider the impacts of current helicopter hazing operations on Yellowstone grizzly bears, a procedural right which could protect its alleged substantive interests. *See Natural Res. Def. Council*, 749 F.3d at 783. We therefore hold that Alliance has standing to pursue its NEPA claim.

## III. Mootness and Section 7 of the ESA

Alliance argues that Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(A)(2), requires the federal defendants to reinitiate consultation on the effect of the Management Plan on Yellowstone grizzly bears due to the extended duration of helicopter hazing and increasing overlap between areas where helicopter hazing occurs and grizzly bear denning areas. The federal defendants argue that Alliance's Section 7 claim is

moot because the federal defendants have already completed a second Biological Evaluation consultation addressing the impact of helicopter hazing on Yellowstone grizzly bears. We agree.

Section 7(a)(2) of the ESA requires federal agencies to ensure, in consultation with the appropriate wildlife agency, that any action authorized or carried out by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). The ESA implementing regulations further require agencies to reinitiate consultation if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b).

The Park Service and FWS conducted a Biological Evaluation in 2000 analyzing the potential effects of the Management Plan on Yellowstone grizzly bears and determined that the Management Plan was "not likely to adversely affect the grizzly bear." In September 2012, the Park Service reinitiated consultation, focusing on the Management Plan's expansion of helicopter hazing operations to the spring and early summer. In this new Biological Evaluation, it concluded that bison hazing operations "may affect, but are not likely to adversely affect listed grizzly bears." The new Biological Evaluation was then forwarded to the FWS, which issued a re-concurrence stating "[w]e have reviewed your November 1 biological evaluation and concur with your determination that hazing operations conducted under the Management Plan may affect, but are not likely to adversely affect grizzly bears." In conducting a second consultation and Biological Evaluation

on the impact of the Management Plan on Yellowstone grizzly bears, and obtaining a second concurrence from the FWS, the federal defendants completed the reinitiation of consultation required by the ESA. *See* 50 C.F.R. § 402.16(b). Reinitiation of consultation is the precise relief sought by Alliance. Accordingly, Alliance's Section 7 claim is moot. *See Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1378–79 (9th Cir. 1978) (holding that a challenge to a mining plan was moot where the action sought to be enjoined had been completed).[4]

## IV. The ESA Claims

### A.  The 60-Day Notice Requirement

Pursuant to Section 11(g)(1)(A) of the ESA, citizen suits are permitted to enjoin persons who are "alleged to be in violation" of the ESA or the applicable regulations.   16 U.S.C. § 1540(g)(1)(A).  A plaintiff who seeks to pursue a citizen suit must comply with a 60-day notice requirement that "put[s] the agencies on notice of a perceived violation of the statute and an intent to sue." *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998).  The notice requirement provides agencies with "an opportunity to review their actions and take corrective measures if warranted." *Id.*  Accordingly, it is a

---

[4] Alliance asserts that under *Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006), it is still entitled to declaratory relief that the Park Service and FWS have a continuing obligation to engage in reconsultation. Unlike in *Johanns*, however, there is no evidence in the summary judgment record to suggest that the Park Service has been uncooperative in the Section 7 consultation process, nor that the Park Service is under any annual obligation to undertake consultation absent new information. *See id*. at 462.  Accordingly, *Johanns* does not apply here.

"mandatory condition[] precedent to commencing suit" under the ESA, *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989), and a failure to comply "acts as an absolute bar to bringing suit under the ESA." *Sw. Ctr. for Biological Diversity*, 143 F.3d at 520.

The question here is whether Alliance complied with the ESA's 60-day notice requirement when it gave notice of its intent to sue under the ESA but then filed a complaint alleging non-ESA claims, later amending the complaint to add ESA claims after the 60-day notice period had expired.[5] We have not previously addressed that precise issue. In light of the plain text of the statute and the persuasive reasoning of other courts that have considered similar notice requirements, we conclude that Alliance properly commenced its ESA suit under § 1540(g)(2)(A)(i) when it filed the amended complaint.

"[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). Section 11(g)(1)(A) states:

> (1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf –

---

[5]    Alliance argues that our prior decision in *Ecological Rights Foundation v. Pacific Gas and Electric Company*, 713 F.3d 502 (9th Cir. 2013), "recognizes that a plaintiff may amend a complaint to add claims after a 60-day notice ripens." In that case, both the original and the amended complaints were filed more than sixty days after notice was given. 713 F.3d at 506–7, 519. Accordingly, *Ecological Rights* did not resolve the question raised here.

> (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof;

16 U.S.C. § 1540(g)(1)(A). Under Section 11(g)(2)(A),

> [n]o action may be commenced under subparagraph (1)(A) of this section . . . (i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation . . . .

16 U.S.C. § 1540(g)(2)(A).

The plain language of § 11(g)(2)(A)(i) unambiguously states that actions under the ESA may not commence until 60 days after a potential plaintiff has notified the Secretary and any alleged violator of a purported ESA violation. In considering the mandatory nature of a similar notice requirement in the Resource Conservation and Recovery Act (the "RCRA") in *Hallstrom*, the Supreme Court concluded that the statutory requirement "could not be clearer," and the notice requirement is a condition precedent that the plaintiff must satisfy before commencing suit. *Hallstrom*, 493 U.S. at 26.[6]

---

[6] As the Supreme Court noted in *Hallstrom*, the language in the notice and delay provision of the RCRA echos the 60-day notice provision in Section 304 of the Clean Air Amendments of 1970. *See Hallstrom*, 493

The text of § 11(g)(2)(A)(i) also makes clear that the notice requirement pertains only to actions commenced under § 11(g)(1)(A). Section 11(g)(2)(A)(i), like the RCRA notice requirement, specifically limits the applicability of the notice requirement to those actions commenced under Section 11(g)(1)(A) of the ESA and extends only to the citizen suit provision contained in the statute. *See Hallstrom*, 493 U.S. at 26; 42 U.S.C. § 6972(b)(1) (1982 ed.). Although the federal defendants urge that the legislative purpose of the notice requirement is to afford agencies a complete "litigation free window" in which to remedy alleged ESA violations, they fail to identify any provision in the statute which suggests that the ESA's notice requirement should be interpreted to preclude filing of a complaint alleging non-ESA claims before the 60-day notice period expires.

Moreover, the legislative purpose of the notice requirement similarly fails to support the federal defendants' arguments. The legislative history of the first citizen suit statute, Section 304 of the Clean Air Act Amendments of 1970, "indicates an intent to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits." *Hallstrom*, 493 U.S. at 29 (citing 116 Cong. Rec. 32927 (1970)). In *Hallstrom*, the Supreme Court emphasized that the notice requirement serves this goal by "allow[ing] Government agencies to take responsibility for enforcing environmental regulations," and "giv[ing] the alleged violator an opportunity to bring itself

U.S. at 23 (citing 42 U.S.C. § 7604 (1982 ed.)). Since the enactment of Section 304, at least sixteen other federal environmental statutes have incorporated almost identical notice provisions, including the ESA. *Id.* at 23 n.1.

into complete compliance with the Act." *Id.* at 29 (internal quotation marks omitted). So too, here: notice of an alleged ESA violation provides federal agencies with an opportunity to "take responsibility" for enforcing the ESA and to correct any violation short of litigation. However, there is nothing in the ESA that remotely suggests that a potential ESA plaintiff must refrain from commencing suit to pursue other non-ESA claims before the 60-day period expires.

Indeed, despite incorporating notice requirements into numerous environmental statutes, *see Hallstrom*, 493 U.S. at 23 n.1, Congress has thus far declined to include such a pre-filing requirement in NEPA and NFMA. Were we to read Section 11(g)(2)(A)(i) as encompassing claims under NEPA and NFMA, we would be imposing a de facto notice requirement for cases that also potentially raise ESA issues where Congress has explicitly declined to do so. This we decline to do. *See Iselin v. United States*, 270 U.S. 245, 251 (1926) (holding that the courts will not read language into a statute where it would result in "an enlargement of [the statute] by the court, so that what was omitted . . . may be included within its scope").

Thus, although Alliance gave notice of its intent to file suit under § 11(g)(1)(A), that notice did not limit its right to file an action alleging non-ESA claims before the 60-day notice period expired. Once the 60-day notice period expired, Alliance could properly commence its suit under the ESA by amending its complaint to include claims under Sections 7 and 9 of the ESA.

We are not the only court to read a provision similar to § 11(g)(2)(A)(i) in this manner. In *Zands v. Nelson*, 779 F. Supp. 1254, 1257 (S.D. Cal. 1991), the district court

addressed whether the plaintiff had prematurely commenced suit under the RCRA when the plaintiff amended the original complaint to add a RCRA claim. The plaintiffs had filed their initial complaint prior to giving the 60-day notice, but waited until almost a year after the notice period expired to amend the complaint. *Id.* The district court concluded that, "for purposes of a notice and delay provision relating to a new claim which appears for the first time in the pleadings in the amended complaint, the Court will look to the filing of the amended complaint to determine when the 'action' is commenced." *Id.* at 1259. In so holding, the district court reasoned that where plaintiffs have claims that do not require notice, they should not be required to forego raising those claims in a timely manner, as "the [c]ourt [does not] believe that Congress intended that the notice and delay provision . . . would impede plaintiffs' ability to bring claims that do not have notice and delay provisions." *Id.* at 1261. Accordingly, the district court aptly noted, while the 60-day notice requirement encourages voluntary compliance with the requisite statute, "[t]his purpose in and of itself does not warrant the creation of a 'non-adversarial' period that is not explicitly in the statute." *Id.* We agree with the reasoning of *Zands* and hold that, for purposes of notice, we may look to the filing of an amended complaint to determine when an action is commenced under the ESA. *See Zands*, 779 F. Supp. at 1259. Accordingly, Alliance properly complied with the requirements of Section 11(g)(2)(A)(i) when it filed an amended complaint alleging its ESA claims after the 60-day notice period expired.[7]

---

[7] The federal defendants and MDOL urge us to follow the reasoning of *Proie v. National Marine Fisheries Service*, No. C11-5955BHS, 2012 WL 1536756 at *4 (W.D. Wash. May 1, 2012), which held that the 60-day notice period must be a "litigation-free window" precluding the filing of

Although we acknowledge the beneficial purposes of the 60-day notice period, these purposes do not outweigh Alliance's right to proceed on its other claims without any waiting period. Had Alliance been unable to file its original complaint while it waited for the notice period to expire, it would have been precluded from seeking a temporary restraining order and preliminary injunction on its NEPA claims until after the ESA notice period had expired. Such a delay could impose significant burdens on plaintiffs when confronted with the need to seek immediate relief. *See Zands*, 779 F. Supp at 1261. Accordingly, we hold that the district court erred in concluding that Alliance could not pursue its ESA claims for failure to comply with § 11(g)(2)(A)(i).[8]

---

any complaint. But *Proie* concerned a different situation. In *Proie*, the plaintiffs gave notice of their intent to sue under the ESA but, 21 days later, filed a complaint alleging claims under the APA seeking judicial review of a purported ESA violation. *Id.* at *1, 3. After the 60-day notice period expired, the plaintiffs filed an amended complaint adding a claim for relief directly under the ESA. *Id.* at *1. Because both the APA and the ESA claims arose from the same alleged ESA violation, the district court determined that the plaintiffs improperly attempted to circumvent the ESA's "litigation-free" period and, therefore, "failed to comply with the requisite notice period." *Id.* at *3–4 (internal quotation marks omitted). Unlike in *Proie*, Alliance's original complaint did not indirectly raise an ESA claim, but instead alleged NEPA and NFMA claims distinct from any ESA violations.

[8]   Alliance sent its original ESA 60-day notice letter to the Forest Service, Park Service, MDOL, USDA and Interior. On July 8, 2011, it served an amended ESA notice naming Inspection Service and FWS. Alliance has subsequently explained that the second ESA notice was "not used by [Alliance] as the basis for litigation." Because Inspection Service and FWS were not given notice of the ESA claims in the original notice, and that is the notice upon which Alliance relies, we affirm the district

## B.  Section 9

Alliance also alleges that the federal defendants and MDOL have violated Section 9 of the ESA.  Alliance contends that the Management Plan's helicopter hazing program has so harassed Yellowstone grizzly bears as to constitute a "take" under Section 9, and that the district court therefore erred in granting the federal defendants summary judgment on this claim and dismissing the claim against MDOL.

Section 9 of the ESA prohibits the taking of an endangered or threatened species.  16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19). "Harass" is further defined as "an intentional or negligent act . . . which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3; *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1068 (9th Cir. 1996).  A take may involve a past or current injury, or the prospect of an imminent threat of harm to a protected species. *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995).

Viewing this record in the light most favorable to Alliance, we hold that the district court did not err in granting summary judgment to the federal defendants on the Section 9 claim and dismissing the claim against MDOL.

---

court's dismissal of Alliance's ESA claims against FWS and Inspection Service.

Alliance alleges that "[h]elicopter hazing operations cause take because they displace grizzly bears, including female bears, from critical spring and summer feeding activities." Included in this record is a video Alliance obtained of a "bison-hazing helicopter operation" which purportedly depicts a "grizzly bear running away from the helicopter" on May 12, 2010. The videographer, however, does not state and the district court could not conclude that "the bear was engaged in any feeding activity, whether before, during, or after its contact with the helicopter."

Alliance also contends that current scientific evidence supports a finding that the flight response of grizzly bears in response to helicopters is not a normal physiological response to being startled, but is indicative of significant disruption to normal behavioral patterns. In support of this argument, Alliance has submitted a report prepared by the Park Service concerning the effects of overflights on wildlife in the parks, including grizzly bears, and the Forest Service's own "Guide to Effects Analysis of Helicopter Use in Grizzly Bear Habitat," which acknowledges the negative effects of helicopters on grizzly bears. Yet the record before the district court at the time of summary judgment lacks evidence to show that MDOL's helicopter hazing is of the type that the report and Guide link to significant disruption of grizzly bear behavioral patterns. The federal defendants acknowledge that the hazing can impact grizzly bears, but assert that hazing operations "infrequently occurred in the presence of grizzly bears" and "would cease if there was evidence of grizzlies being active in the area." Although there was evidence in the summary judgment record that helicopters had flown over bears, there was no evidence that helicopters had continued hazing operations in areas with signs of grizzly bear presence in violation of the instructions to stop.

Accordingly, we affirm the district court's conclusion that on this record Alliance has failed to raise a triable issue as to whether a take has occurred or is likely to occur under Section 9 of the ESA.

## V. NEPA

In addition to its ESA claims, Alliance also seeks reversal of the district court's grant of summary judgment to the federal defendants on its NEPA and NFMA claims.[9]

Under NEPA, federal agencies are directed to prepare an EIS to analyze the environmental consequences of their proposed actions. 42 U.S.C. § 4332(2)(C). This requirement "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Although NEPA does not impose substantive obligations on agencies, the EIS is a "procedural requirement[] designed to force agencies to take a 'hard look' at environmental consequences." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003). Once an original EIS has been completed, NEPA requires that agencies perform a supplemental EIS whenever "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns or [] [t]here are significant new circumstances or information relevant to environmental

---

[9] Alliance's only claim for relief under the NFMA is that, to the extent there is any supplemental EIS prepared for the Management Plan, any action conducted in part in the Gallatin National Forest must comply with the Gallatin National Forest Plan under NFMA. Because a supplemental EIS is not required, we do not further address the NFMA claim.

concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1); *see also Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 560 (9th Cir. 2006). An impact on a threatened or endangered species is a factor that can give rise to the requirement to perform a supplemental EIS.  40 C.F.R. § 1508.27(b)(9).

In support of its claim that the federal defendants are required to prepare a supplemental EIS, Alliance alleges three "significant new circumstances or information" pertaining to the Management Plan.  First, while the final EIS for the Management Plan indicated that hazing impacts on Yellowstone grizzly bears would end in April or May, helicopter hazing now extends into June and July.  Second, although the final EIS contemplated that Yellowstone grizzly bears would be denning, or at higher elevations, during hazing operations, "most hazing now occurs after denning and den emergence, and grizzly bears are consistently present in the lower elevation areas where hazing occurs during most hazing operations."  Third, the final EIS indicated that hazing would be stopped if there was evidence of Yellowstone grizzly bear activity in the hazing operation area, but hazing operations remain ongoing despite such actions.  Because the federal defendants' considered these issues during the initial final EIS process, we affirm the district court's grant of summary judgment to the federal defendants.[10]

As the district court noted, the final EIS contemplated that helicopter hazing might occur in varying time frames as required to successfully migrate bison back to Yellowstone

---

[10]   We assume, without deciding, that the circumstances here constitute ongoing major Federal action for purposes of 42 U.S.C. § 4332(2)(C). *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 72 (2004).

National Park.  Thus, the approval of the final EIS was not tied to the complete absence of Yellowstone grizzly bears from the hazing region.  Rather, the final EIS acknowledged that "the average emergence date for bears is in March . . . ," and, accordingly, some overlap between hazing operations and Yellowstone grizzly bear presence might be inevitable.  Indeed, the final EIS explicitly incorporated this "possibility of overlap" it its ultimate determination that "[b]ison management activities such as hazing," "would not have more than a negligible impact on grizzly bears."  Thus, while the final EIS presumed that the majority of helicopter hazing operations would occur while Yellowstone grizzly bears were still in hibernation, the final EIS does not *require* that this be the case.  Instead, the final EIS considered the potential impacts to Yellowstone grizzly bears even were encounters to occur.  To the extent that the final EIS contemplated that evidence of grizzly bear activity in the area might force helicopter hazing operations to cease, this remains the policy of the Management Plan.  Disputes may arise as to whether this policy has been violated by the alleged harassment of Yellowstone grizzly bears by helicopters, *see supra* Section IV.B., but the final EIS clearly evaluated the Management Plan's policy toward encounters between hazing operations and Yellowstone grizzly bears.

Although Alliance argues that the federal defendants "have essentially already conceded this issue," by engaging in reconsultation under Section 7, these two procedural requirements are distinct.  Reconsultation under Section 7 does not imply that "significant new circumstances or information" have arisen which would also require analysis under NEPA.  40 C.F.R. § 1502.9(c)(1).  Rather, they are independent inquiries resulting in independent evaluations.  Moreover, to the extent that the 2012 Biological Evaluation

has any bearing on the need to complete a supplemental EIS, the Biological Evaluation concluded that new information available on the impact of helicopter hazing on Yellowstone grizzly bears was not so significant as to change the original determination concerning whether the Management Plan was likely to adversely affect grizzly bears.

Accordingly, we hold that the federal defendants considered the possibility of extended helicopter hazing and encounters with Yellowstone grizzly bears in the initial EIS and, thus, the information presented by Alliance does not establish a substantial change in the proposed action nor significant new circumstances or information requiring the federal defendants to supplement the EIS.  *See* 40 C.F.R. § 1502.9(c)(1).

## VI. Conclusion

We reverse the district court's holding that Alliance lacked standing to bring its ESA and NEPA claims.  We also reverse the district court's ruling that Alliance failed to comply with the ESA citizen suit 60-day notice provision. We affirm, however, the dismissal of all of Alliance's ESA claims against Inspection Service and FWS as they were not included in the 60-day notice on which Alliance relies.  We affirm the district court's grant of summary judgment to the federal defendants and grant of dismissal to MDOL on Alliance's ESA Section 7 claim as it is moot.  We also affirm the district court's grant of summary judgment to the federal defendants and grant of dismissal to MDOL on Alliance's Section 9 claim, as no genuine issues of material fact exist in this record concerning whether a take of a Yellowstone grizzly bear has occurred or is likely to occur.  Finally, we

affirm the grant of summary judgment to the federal defendants on the NEPA and NFMA claims.

**AFFIRMED IN PART AND REVERSED IN PART.**

The parties shall bear their own costs on appeal.