**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL; SAN FRANCISCO BAYKEEPER; FRIENDS OF THE RIVER; THE BAY INSTITUTE; WINNEMEM WINTU TRIBE; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INC., | No. 21-15163 <br><br> D.C. No. 1:05-cv-01207-DAD-EPG |
| *Plaintiffs-Appellants*, | OPINION |
| v. | |
| DEBRA HAALAND, in her official capacity as Secretary of the Interior[*]; MARIA CAMILLE CALIMLIM TOUTON, in her official capacity as Acting Commissioner of the Bureau of Reclamation; MARTHA WILLIAMS, in her official capacity as Acting Director of the U.S. Fish and Wildlife Service; ANDERSON-COTTONWOOD IRRIGATION DISTRICT; CITY OF REDDING; M & T CHICO RANCH, (Pacific Realty | |

---

[*] Debra Haaland has been substituted for her predecessor, Scott de la Vega, as Secretary of the Interior under Fed. R. App. P. 43(c)(2).

Associates); RECLAMATION
DISTRICT NO. 1004; CONAWAY
PRESERVATION GROUP; DAVID
AND ALICE TE VELDE FAMILY
TRUST; KNIGHTS LANDING
INVESTORS, LLC; PELGER ROAD
1700, LLC; SUTTER MUTUAL
WATER CO.; MERIDIAN FARMS
WATER COMPANY; HENRY D.
RICHTER; HOWALD FARMS, INC.;
OJI BROTHERS FARMS, INC.; OJI
FAMILY PARTNERSHIP; CARTER
MUTUAL WATER COMPANY;
WINDSWEPT LAND AND
LIVESTOCK COMPANY;
MAXWELL IRRIGATION
DISTRICT; TISDALE IRRIGATION
AND DRAINAGE COMPANY;
BEVERLY F. ANDREOTTI;
ARNOLD A. ANDREOTTI;
MICHAEL D. ANDREOTTI; MARK
C. ANDREOTTI; ABDUL RAUF;
TAHMINA RAUF; COELHO
FAMILY TRUST; EAGLE FIELD
WATER DISTRICT; FRESNO
SLOUGH WATER DISTRICT;
MERCY SPRINGS WATER
DISTRICT; ORO LOMA WATER
DISTRICT; TRANQUILLITY
IRRIGATION DISTRICT; JAMES
IRRIGATION DISTRICT; DEL
PUERTO WATER DISTRICT;
BANTA-CARBONA IRRIGATION

DISTRICT; PATTERSON IRRIGATION DISTRICT; WEST STANISLAUS IRRIGATION DISTRICT; WEST SIDE IRRIGATION DISTRICT; BYRON BETHANY IRRIGATION DISTRICT,

*Defendants-Appellees*,

GLENN-COLUSA IRRIGATION DISTRICT; PRINCETON-CODORA-GLENN IRRIGATION DISTRICT; PROVIDENT IRRIGATION DISTRICT; RECLAMATION DISTRICT 108; NATOMAS CENTRAL MUTUAL WATER COMPANY; RIVER GARDEN FARMS COMPANY; PLEASANT GROVE-VERONA MUTUAL WATER COMPANY; PELGER MUTUAL WATER COMPANY; SAN LUIS & DELTA-MENDOTA WATER AUTHORITY; WESTLANDS WATER DISTRICT,

*Intervenor-Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of California
Dale A. Drozd, District Judge, Presiding

Argued and Submitted March 31, 2023
San Francisco, California

Filed May 23, 2024

Before:  Ronald M. Gould and Sandra S. Ikuta, Circuit
Judges, and James V. Selna,[**] District Judge.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Gould

## SUMMARY[***]

### Environmental Law

In an action brought by the National Resources Defense Council and other environmental interest groups (collectively, "NRDC") alleging that the Bureau of Reclamation (Reclamation) and the Fish and Wildlife Service (FWS) violated the Administrative Procedure Act (APA) and Endangered Species Act (ESA) by failing to engage in an adequate consultation over whether the renewal of government water supply contracts would likely jeopardize the existence of the delta smelt and by failing to reinitiate consultation with the National Marine Fisheries Service (NMFS) regarding the contracts' effects on Chinook

---

[**] The Honorable James V. Selna, United States District Judge for the Central District of California, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

salmon, the panel affirmed the district court and held that the federal agencies complied with their obligations under the APA and ESA.

This appeal arises from Reclamation's operation of the Central Valley Project (CVP), the largest federal water management project in the United States. In the 1960s, Reclamation entered into Settlement Contracts with Sacramento River Contractors, as well as contracts to supply water from the Delta-Mendota Canal (the "DMC Contracts"). After the Settlement Contracts and DMC Contracts (collectively, the "Contracts") began to expire in the 2000s, Reclamation began consultation regarding renewal of the Contracts. Reclamation also began consultation regarding the environmental effects of the Central Valley Project's Operations Criteria and Plan (OCAP). Extensive litigation ensued.

The panel held that NRDC's claims with respect to twelve of the DMC Contracts were not moot.

The panel affirmed the district court's summary judgment in favor of the agencies on NRDC's fourth claim of relief, which alleged that FWS conducted an inadequate consultation on the effects of the Contract renewals on delta smelt and its critical habitat. The panel rejected NRDC's arguments that (1) FWS erred in relying on a 2008 OCAP biological opinion in its 2015 letter of concurrence or failed to adequately analyze the effects that Contract renewals would have on the delta smelt; (2) FWS violated its obligations under the ESA by failing to ensure that its 2015 consultation was based on the best scientific and commercial data available; (3) FWS impermissibly postponed its analysis of the impacts of the Settlement Contract renewals on the delta smelt to an unspecified future consultation; and

(4) FWS's 2015 letter of concurrence was invalid because it failed to consider the effects of renewing the Settlement Contracts through 2045.

The panel affirmed the district court's summary judgment in favor of the agencies on NRDC's second claim for relief, which alleged that Reclamation was arbitrary and capricious and violated section 7 of the ESA by executing and implementing Contracts in reliance on FWS's allegedly faulty analysis. The panel first held that NRDC satisfied the ESA's notice requirements. The panel next held that Reclamation's consultation with FWS was not inadequate, FWS's 2015 letter of concurrence was not arbitrary and capricious, and therefore, Reclamation did not act arbitrarily and capriciously by relying on it. The panel also rejected NRDC's argument that Reclamation violated its obligations under the ESA by misinforming FWS regarding the scope of its discretion to negotiate the Settlement Contracts.

The panel affirmed the district court's dismissal for failure to state a claim of NRDC's fifth claim for relief, which alleged that Reclamation unlawfully failed to reinitiate consultation with NMFS regarding the effect of continued implementation of the Settlement Contracts on the winter-run and spring-run Chinook salmon in light of new information about the alleged ecological effects of the parties' agreements. The renewed Settlement Contracts did not give Reclamation the discretion to take measures that would benefit the Chinook salmon.

Concurring in part and dissenting in part, Judge Gould agreed with the majority that NRDC's claims are neither moot nor time barred; that the district court's grant of summary judgment to Defendants-Appellees on NRDC's fourth claim for relief, as to the DMC Contracts only, was

proper because FWS's delta smelt consultation was not arbitrary or capricious as to the DMC Contracts; and that the district court's grant of summary judgment to Defendants-Appellees on NRDC's second claim for relief was proper because Reclamation engaged in a valid consultation with FWS and did not misinform FWS about its discretion to negotiate the contracts.

However, Judge Gould parted ways with the majority opinion's resolution of two of NRDC's claims challenging the renewal of the Settlement Contracts. Because FWS did not consider the effect of renewing the Settlement Contracts through 2045, the end of the renewed Settlement Contracts' term, he concluded that the district court erred in dismissing NRDC's fourth claim for relief as to the Settlement Contracts. And because Reclamation retained some discretion under the Settlement Contracts such that the ESA required Reclamation to reinitiate consultation on the Contracts' effects on chinook salmon, he also concluded that the district court erred in dismissing NRDC's fifth claim for relief.

## COUNSEL

Barbara J. Chisholm (argued), Corinne Johnson, and Hamilton Candee, Altshuler Berzon LLP, San Francisco, California; Katherine Poole and Douglas A. Obegi, Natural Resources Defense Council, San Francisco, California; Stacey P. Geis, Nina Robertson, and Marie E. Logan, Earthjustice, San Francisco, California; for Plaintiffs-Appellants.

Katelin Shugart-Schmidt (argued) and Robert Lundman, Attorneys; Lesley Lawrence-Hammer, Trial Attorney; Todd

Kim, Assistant Attorney General; Environment and Natural
Resources Division, United States Department of Justice,
Denver, Colorado; Nicole M. Smith, Trial Attorney,
Environment and Natural Resources Division, United States
Department of Justice, Washington, D.C.; Coby Howell,
Assistant United States Attorney, Office of the United States
Attorney, United States Department of Justice, Portland,
Oregon; Meredith E. Nikkel (argued), Samuel Bivins, and
Kevin M. O'Brien, Downey Brand LLP, Sacramento,
California; Jared S. Mueller, Brittany K. Johnson, Andrew
M. Hitchings, Stuart L. Somach, Somach Simmons & Dunn,
Sacramento, California; Daniel J. O'Hanlon (argued),
Kronick Moskovitz Tiedemann & Girard, Sacramento,
California; Rebecca R. Akroyd General Counsel, San Luis
& Delta-Mendota Water Authority, Sacramento, California;
Jeanne M. Zolezzi, Herum Crabtree Suntag, Stockton,
California; Alan F. Doud, Young Wooldridge LLP,
Bakersfield, California; Lauren D. Layne and Gabriel A.
Delgado, Baker Manock & Jensen PC, Fresno, California;
Jon D. Rubin General Counsel, Westlands Water District,
Fresno, California; Michael E. Vergara, Somach Simmons
& Dunn, Sacramento, California; Diane V. Rathmann,
Linneman Law, Dos Palos, California; for Defendants-
Appellees.

# OPINION

IKUTA, Circuit Judge:

This appeal involves another battle in the "continuing war over protection of the delta smelt." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 591 (9th Cir. 2014) (citation omitted). The Natural Resources Defense Council, along with several other environmental interest groups (collectively, "NRDC"), claims that the Bureau of Reclamation (Reclamation) and the Fish and Wildlife Service (FWS) violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, and Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1544, by failing to engage in an adequate consultation over whether the renewal of various government water supply contracts would likely jeopardize the existence of the delta smelt, a small fish listed as threatened under the ESA. NRDC also challenges Reclamation's decision not to reinitiate consultation with the National Marine Fisheries Service (NMFS) regarding the contracts' effects on the spring-run and winter-run Chinook salmon. We conclude that the federal agencies complied with their obligations under the APA and ESA, and we affirm.

## I

Section 7(a)(2) of the ESA requires a federal agency, "in consultation with and with the assistance" of FWS or NMFS, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of a critical habitat. 16 U.S.C. § 1536(a)(2); *see also id.* § 1532(5) (definition of "critical habitat"). If an agency determines

that its proposed action "may affect listed species or critical habitat," it must consult with FWS or NMFS before acting.[1] 50 C.F.R. § 402.14(a); *see also San Luis*, 747 F.3d at 596. "Section 7(a)(2) consultation is required so long as the federal agency has 'some discretion' to take action for the benefit of a protected species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (en banc) (citation omitted). Unlike the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370m-11, the ESA does not require the action agency (here, Reclamation) to consider a no-action alternative or any other alternative to its proposed action. *Compare* 42 U.S.C. § 4332(2)(C)(iii) (NEPA), *with* 16 U.S.C. § 1536(a)(2) (ESA). The only question is whether the action agency's proposed action is likely to have an adverse effect on listed species or critical habitats. 16 U.S.C. § 1536(a)(2). In fulfilling its consultation requirements under the ESA, "each agency shall use the best scientific and commercial data available." *Id.*

In complying with these obligations, the action agency generally prepares a biological assessment to determine whether any listed species that may be present in the area "is likely to be affected" by the proposed action. *Id.* § 1536(c)(1). Depending on the results of the biological assessment, the action agency may engage in an informal consultation or formal consultation with the resource agency (either FWS or NMFS). Informal consultation is "an optional process that includes all discussions,

---

[1] FWS has jurisdiction over terrestrial and freshwater species, like the delta smelt, whereas NMFS has jurisdiction over marine and anadromous species, such as the Chinook salmon. *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1063 n.1 (9th Cir. 2004), *amended by* 387 F.3d 968 (9th Cir. 2004) (citing 50 C.F.R. § 402.01).

correspondence, etc." between the action agency and appropriate resource agency and is "designed to assist the [action] agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13(a). If the resource agency concurs with the action agency "that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* § 402.13(c); *see also Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 883 (9th Cir. 2022) ("If the [resource] agency concurs in writing, informal consultation is complete, and no further action is required under the ESA.").

Formal consultation is required if the action or resource agency concludes that the proposed action is likely to adversely affect listed species or a critical habitat. *See* 50 C.F.R. §§ 402.14(a)–(b). If the action agency initiates formal consultation, the resource agency must issue a biological opinion that summarizes "the information on which the opinion is based" and determines whether the action would likely jeopardize a listed species or critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1). If the resource agency determines the action would do so, it issues a "jeopardy" opinion and must suggest any "reasonable and prudent alternatives" (RPA) that the action agency can implement to avoid jeopardizing a listed species or adversely modifying a critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(h)(1)(iv)(A), (h)(2).

If the implementation of a proposed action or an RPA would cause an incidental take of the species,[2] the resource

---

[2] "Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02. "The term 'take'

agency must include with its biological opinion an "incidental take statement" that specifies the "amount or extent" of the permissible incidental taking of the species. 50 C.F.R. § 402.14(i)(1)(i). The resource agency issues an incidental take statement only after it determines that "the resultant incidental take of listed species will not" itself be likely to jeopardize the species or cause adverse modification of its critical habitat. *Id.* § 402.14(i)(1).

After formal or informal consultation has been completed, an action agency must reinitiate consultation with the relevant resource agency "where discretionary Federal involvement or control over the action has been retained or is authorized by law and . . . new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a). That is, an agency's duty to reinitiate consultation is triggered if it retains some discretion to take measures that would "inure to the benefit of a protected species." *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 975 (9th Cir. 2003). Even if the "underlying [agency] action is complete," an agency must still satisfy its "obligations under Section 7," including reinitiation of consultation, to the extent "it retains regulatory authority over the action." *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1087 (9th Cir. 2015).

We review administrative decisions involving the ESA under the APA. *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 38 F.4th 34, 44 (9th Cir. 2022). Under the APA,

---

means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

agency action is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That standard is "highly deferential," *San Luis*, 747 F.3d at 601, and that deference "is at its highest where a court is reviewing an agency action that required a high level of technical expertise," *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1043 (9th Cir. 2015). "The agency's decision is entitled to a presumption of regularity, and we may not substitute our judgment for that of the agency." *San Luis*, 747 F.3d at 601 (cleaned up). We consider the whole record when reviewing an agency's decision under the APA. *See* 5 U.S.C. § 706. "That includes everything that was before the agency pertaining to the merits of its decision." *Goffney v. Becerra*, 995 F.3d 737, 747 (9th Cir. 2021) (cleaned up).

## II

This appeal arises from Reclamation's operation of the Central Valley Project (CVP), "the largest federal water management project in the United States," *San Luis & Delta-Mendota Auth. v. Locke*, 776 F.3d 971, 984 (9th Cir. 2014) (citation omitted), and Reclamation's decades-long history of obtaining the necessary environmental approvals to do so.

## A

The CVP, which operates in conjunction with California's State Water Project (SWP), is a network of reservoirs, canals, dams and hydroelectric powerplants that draws and regulates water from the Sacramento–San Joaquin River Delta. Reclamation releases water from northern California reservoirs; that water then flows into the Sacramento River before ultimately reaching the Sacramento–San Joaquin Delta. *See id.* From the Delta, pumping plants "lift[] water . . . into pipes that deliver it into

the California Aqueduct or the Delta-Mendota Canal," which "deliver the water to agricultural users in the Central Valley and domestic users in central and southern California." *Id.* (cleaned up).

Before the CVP's existence, various parties used Sacramento River water for agricultural and other purposes. Collectively, these parties (referred to here as the "Sacramento River Contractors") have longstanding water rights to a significant portion of the water available for appropriation from the Sacramento River. Those rights pre-date federal Reclamation statutes and are senior to rights held by the federal government for the CVP. The Sacramento River Contractors also have their own conveyance facilities, allowing them to divert water without the need to rely on government facilities. Reclamation's ability to operate the CVP therefore depends on the cooperation and agreement of these senior water-rights holders.

In the 1960s, Reclamation entered into agreements (Settlement Contracts) with the Sacramento River Contractors pursuant to congressional authorization. The original Settlement Contracts "grant [Reclamation] some rights to the encumbered water," allowing it to operate the CVP, "while also providing senior rights holders a stable supply of water." *Jewell*, 749 F.3d at 780. These original Settlement Contracts had a term of 40 years. Reclamation also entered into contracts to supply water from the Delta-Mendota Canal to users who did not claim senior rights. *Id.* (We refer to the Delta-Mendota Canal water supply contracts as the "DMC Contracts," and the contractors as the "DMC Contractors.") The Settlement Contracts and DMC Contracts (collectively, the "Contracts") began to expire in the early 2000s. *See id.*

In 1992, Congress enacted the Central Valley Project Improvement Act (CVPIA), Pub. L. No. 102-575, § 3401 *et seq.*, 106 Stat. 4600, 4706–31 (1992), which required that the Secretary of the Interior operate the CVP in compliance with federal and state law, § 3406(b), and renew existing long-term CVP water supply contracts on terms that complied with the CVPIA's provisions, § 3404(c). In 1998, Reclamation initiated consultation under section 7 of the ESA with FWS on the implementation of the CVPIA and the continued operation and maintenance of the CVP. As part of this consultation, Reclamation and FWS established a two-track process. The first track would involve consultation on the coordinated operation of the CVP and SWP, resulting in a broad, program-wide biological opinion. The second track would involve consultations on narrower, discrete actions, such as the renewal of specific water contracts, and result in decisions that could be based on (or tiered from) the broader biological opinion. Thus, FWS's 2000 CVPIA biological opinion explained that it "addresse[d] the effects upon listed species resulting from implementation of this suite of actions as a whole, and provide[d] a strategy, or process, to determine how ESA compliance will be accomplished for individual activities that cumulatively make up the program." In detailing the strategy for consultation on narrower actions relating to the CVP, the 2000 CVPIA biological opinion explained that "[o]nce the long-term contract renewal negotiations are completed, the renewals will be subject to a separate, tiered analysis," and that "Reclamation will consult either formally or informally with [FWS] before executing a contract." "For some [water] districts, contract consultation could be conducted *informally*," such as contract renewals involving "water districts at full build out, that have well-established district

boundaries, that *may affect* listed species, and are in compliance with other applicable biological opinions." Reclamation and FWS have adhered to this procedure of engaging in a broader first-track consultation regarding the coordinated operation of the CVP and SWP as a whole (referred to as the CVP "Operations Criteria and Plan" or "OCAP"), including all diversions of water under water supply contracts, and separately engaging in narrower second-track consultations regarding the negotiation of specific water supply contracts or groups of contracts.

After the Contracts began to expire in the 2000s, Reclamation began preparing for a second-track consultation regarding the renewal of the Contracts. It first prepared biological assessments, which concluded that renewing the Contracts would not likely adversely affect listed species. Based on that conclusion, Reclamation initiated informal consultation with FWS.

Around the same time, Reclamation also engaged in a first-track formal consultation with FWS regarding the environmental effects of the OCAP. In July 2004, FWS issued a biological opinion addressing the environmental effects of operating the CVP and SWP. It concluded that CVP and SWP operations, which included the delivery of water pursuant to the proposed renewal Contracts, would not jeopardize the continued existence of the delta smelt. *See Jewell*, 749 F.3d at 781. In August 2004, however, our decision in *Gifford Pinchot Task Force v. United States Fish & Wildlife Service* held that a regulation on which that biological opinion had relied was unlawful. 378 F.3d 1059,

1069 (9th Cir. 2004), *amended by* 387 F.3d 968 (9th Cir. 2004).[3]

In response to *Gifford Pinchot*, Reclamation reinitiated formal consultation on the effects of the OCAP with respect to the delta smelt. In February 2005, FWS issued a new OCAP biological opinion which "addressed the operation of the CVP/SWP in the Sacramento Valley, and included all commitments of the SWP and CVP, such as meeting requirements of the [2000 CVPIA biological opinion]," as well as "the obligations contained in the Central Valley Water Quality Control Board water rights permits, obligations of CVP water service contracts, Sacramento River Settlement contracts, . . . and other requirements." The OCAP biological opinion therefore "addressed all the aquatic effects of operating the CVP/SWP." Once again, FWS concluded that the OCAP would not likely jeopardize the delta smelt.

After issuing this 2005 OCAP biological opinion, FWS responded to Reclamation's second-track consultation on the renewal of the water supply Contracts by issuing four letters of concurrence. The letters of concurrence discussed the difference between the first-track OCAP consultation and the second-track Contract-specific consultations, stating: "The OCAP consultation analyzed the effects of numerous new actions on the delta smelt and its designated critical habitat," including accounting for all CVP commitments, such as the "obligations of CVP water service contracts," whereas FWS's "consultations on the long-term

---

[3] Also in 2004, Reclamation formally consulted with NMFS regarding the effects of CVP and SWP operations on the Chinook salmon and other marine species. This resulted in NMFS's 2004 no-jeopardy biological opinion.

water-service contract renewals and Settlement contract renewals are addressing the diversion of Sacramento River water at prescribed diversion points." "In other words," FWS explained, "the contracts create a demand . . . for CVP water and the OCAP consultation addresses how the CVP/SWP projects are operated to meet those demands." The "linkages" between the "contract renewals and the operation of the CVP/SWP," FWS noted, were "addressed in separate but parallel consultations such that all possible effects on listed species are being identified and consulted on." The letters of concurrence considered the full scope of impacts that renewal of the Contracts would have, including on species other than the delta smelt.

In the three letters of concurrence that addressed renewal of the Settlement Contracts, FWS explained that it had assumed Reclamation would deliver the full amount of water required under each contract each year, for the entire length of the Contract. The letters of concurrence detailed the background and history of the Contracts, as well as the terms of the Contracts. For example, the letters explained that "[e]ach Settlement Contract quantifies the total amount of water that could be diverted annually," that the water "supply is allocated on a monthly basis" for each Contract, that the Contracts contain "shortage provisions" whereby "[d]uring periods of reduced supply, water deliveries are decreased according to terms in the contracts," and that the "proposed renewal contracts contain new pricing provisions." With respect to water transfers, FWS recognized that the Contracts would allow "CVP transfers with the Contracting Officer's consent." The letters explained that the "expiring Settlement Contracts [had] not contain[ed] language concerning water measurement or conservation," but that the "proposed renewal contracts

[would] require the implementation of a water conservation efficiency plan" before the diversion of CVP water. The letters of concurrence also provided a detailed description of the environmental baseline of all the "species, habitats (including critical habitats), and ecosystems within the action area," as well as explaining all the conservation measures that Reclamation would take in the action areas.

In addressing the impacts of Contract renewal on the delta smelt, the letters of concurrence relied on the OCAP biological opinion, because it had already "addressed the effects of delivering CVP water for renewed long-term water contracts and other actions on delta smelt and its critical habitat." Accordingly, the letters of concurrence "incorporated by reference" the "OCAP consultation analysis" into the "Settlement Contract renewal consultation." "The OCAP consultation analyzed the effects of numerous new actions on the delta smelt and its designated critical habitat, including storage of CVP and SWP water in reservoirs, water releases from reservoirs, river operations, operation of the Federal/State diversion facilities, and the CVP/SWP export-pumping operations in the Delta." The 2005 letters of concurrence concluded that renewal of the Settlement Contracts would not likely affect the delta smelt or its critical habitat.

The fourth letter of concurrence was for the renewal of the DMC Contracts. It likewise explained that the OCAP biological opinion "addressed the effects of delivering CVP water for renewed long term water contracts and other actions on delta smelt and its critical habitat." FWS assumed that Reclamation would deliver the full amount of water required under each contract each year, for the entire length of the DMC Contracts. The DMC letter of concurrence "incorporated by reference" the first-track OCAP biological

opinion "because it analyzed effects of the action addressed in this consultation, and the findings of this consultation cannot be made independently of the analysis and findings of the OCAP biological opinion."  It further explained that "[t]he OCAP analysis of effects to delta smelt and its critical habitat also must be made a part of the analysis of the total effects of the long term contract renewals."  And it likewise concluded that renewal of the DMC Contracts would not likely affect the delta smelt or its critical habitat.

In short, "[e]ach FWS concurrence letter explained that renewing the Contracts would increase the demand for water, but that, according to the 2004 and 2005 [OCAP biological opinions], this demand would not adversely affect the delta smelt." *Jewell*, 749 F.3d at 781.

Throughout 2004 and 2005, based on FWS's OCAP biological opinions and letters of concurrence, Reclamation renewed 141 Settlement Contracts and 18 DMC Contracts. *See Jewell*, 749 F.3d at 781.[4]

B

In February 2005, NRDC initiated this lawsuit, challenging the 2004 OCAP biological opinion and, after amending its complaint, the 2005 OCAP biological opinion. In 2007, the 2005 OCAP biological opinion was held invalid. *See id.*; *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 387–88 (E.D. Cal. 2007).  Reclamation did not appeal that decision.[5]

---

[4] The parties do not dispute that the terms of the renewed Settlement Contracts and DMC contracts are identical in all material respects.

[5] In a parallel action, the 2004 NMFS biological opinion was also held invalid, and this ruling was also not appealed. *See Pac. Coast Fed'n of*

In April 2008, after FWS's 2005 OCAP biological opinion regarding the delta smelt was held invalid, NRDC filed a third amended complaint challenging FWS's second-track consultation on the renewal of the Contracts. NRDC sought to set aside the "41 renewed Contracts that [the plaintiffs] deem most harmful to the delta smelt" on the ground that Reclamation failed to engage in an adequate consultation with FWS under section 7 of the ESA. *Jewell*, 749 F.3d at 781.

Meanwhile, because FWS's 2004 and 2005 OCAP biological opinions had been invalidated, Reclamation again initiated first-track consultation with FWS regarding the environmental effects of the OCAP. In December 2008, FWS issued a new biological opinion. Unlike the 2004 and 2005 OCAP biological opinions, the 2008 OCAP biological opinion concluded that operating the CVP and SWP would jeopardize the continued existence of the delta smelt. *Id.* The 2008 OCAP biological opinion, however, proposed RPAs that, if implemented, "would avoid jeopardizing the delta smelt." *Id.* at 782. In addition, FWS issued an incidental take statement which presumed the RPAs would be implemented. *San Luis*, 747 F.3d at 599. FWS determined that, with the implementation of the RPAs, the incidental take caused by CVP and SWP operations, accounting for the full extent of the parties' obligations under the Contracts, would not likely result in jeopardy to the delta smelt or the adverse modification of a critical

---

*Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1122, 1193–94 (E.D. Cal. 2008). In 2009, NMFS issued a new biological opinion that assessed the effects of the OCAP on the Chinook salmon. We upheld NMFS's 2009 biological opinion in its entirety. *See Locke*, 776 F.3d at 981.

habitat.  *Id.*  We later upheld FWS's 2008 OCAP biological opinion in full.  *See id.* at 601, 606.

During this same period, NRDC's challenge to the adequacy of Reclamation's second-track consultation with FWS regarding the renewed Contracts (based on NRDC's then-operative third amended complaint) was pending before the district court.  On cross-motions for summary judgment, the district court held that NRDC "lack[ed] Article III standing to challenge the DMC Contracts" because it had failed to show that its injuries were traceable to Reclamation's alleged failure to consult with FWS before renewing the DMC Contracts.  *Jewell*, 749 F.3d at 781. Second, the district court held that NRDC's challenge to the Settlement Contracts failed as a matter of law.  According to the district court, the ESA's consultation requirement under section 7(a)(2) did not apply because Reclamation lacked discretion to modify the Settlement Contracts' terms in a way that would benefit listed species.  *Id.* at 781, 784.

We reversed the district court in *Jewell* in 2014.  *Jewell* first addressed Reclamation's argument that any alleged failure to conduct adequate consultations with FWS regarding the renewal of the Contracts in 2004 or 2005 was moot because Reclamation subsequently consulted with FWS in 2008, leading to the issuance of the 2008 OCAP biological opinion.  We held that Reclamation's consultation with FWS in 2008 regarding the implementation of the OCAP did not moot the appeal.  *Id.* at 782.  We explained that although the 2008 OCAP biological opinion considered the full extent of delivering water under the Contracts in the context of assessing CVP operations as a whole, it did not constitute a consultation for the separate and distinct action of renewing the Contracts.  Because the 2008 OCAP biological opinion did not "represent a consultation with

FWS concerning the impact of [Reclamation's] decision to renew the specific contracts" at issue, Reclamation had "never reconsulted with FWS regarding the effects of renewing these contracts." *Id.* Accordingly, NRDC's claims were not moot, as the remedy it sought, "an injunction requiring reconsultation with FWS and renegotiation of the challenged contracts based on the FWS' assessment," remained available. *Id.*

Next, we held that NRDC had standing to challenge the validity of the DMC Contracts because it alleged a procedural violation of section 7(a)(2) of the ESA and could show that consultation might result in better protection of its interests. *Id.* at 783–84.

Finally, *Jewell* disagreed with the district court's conclusion that NRDC's claim failed as a matter of law. We held that Reclamation "retained 'some discretion'" in its contract negotiations with the Sacramento River Contractors to take measures that would benefit the delta smelt, such as deciding not to renew the Settlement Contracts at all or changing key terms. *Id.* at 785. Therefore, Reclamation was obliged "to engage in Section 7(a)(2) consultation prior to renewing the Settlement Contracts." *Id.* *Jewell* did not explain what that consultation required. Nor did it hold that FWS could not rely on its 2008 OCAP biological opinion in performing its consultation to determine whether renewal of the Contracts would likely adversely affect the delta smelt. In short, *Jewell* held that the relief NRDC sought was not foreclosed and the case could go forward, but it did not address the merits of NRDC's claims.

Following *Jewell*, in June 2015, the district court stayed the litigation to allow Reclamation to initiate consultation with FWS on the renewal of the Contracts.

Before reinitiating this second-track consultation, Reclamation began the first of several reinitiations of the first-track consultation, based on a provision in the 2008 OCAP biological opinion allowing reinitiation of consultation if a water year is classified as dry or critically dry for a second consecutive year. After historic drought years in 2014 and 2015, Reclamation sought multiple concurrences from FWS regarding its drought response.

Certain baseline assumptions in the 2008 OCAP biological opinion relied in part on a California State Water Resources Control Board (State Water Board) decision, known as D-1641, regarding the flow requirements for the Sacramento-San Joaquin Delta. In its reinitiation requests, Reclamation explained to FWS that it had submitted Temporary Urgency Change Petitions to the State Water Board and obtained permission to deviate from the requirements of D-1641. In response to Reclamation's reinitiations of consultation, FWS issued numerous concurrences determining that "[a]lthough the proposed modifications to D-1641 were not anticipated in the project description for the 2008 [biological opinion], the resulting effects to Delta Smelt . . . appear to be within the range of effects previously analyzed in the 2008 [biological opinion]." FWS, therefore, concurred that the State Water Board's grant of Reclamation's petitions would "result in no additional adverse effects on Delta Smelt or its critical habitat for [the various months at issue] beyond those previously analyzed in the 2008 [biological opinion]."

While these first-track reinitiations of consultation were ongoing, Reclamation returned to its second-track consultation. In July 2015, it sought FWS's concurrence that the 2008 OCAP biological opinion adequately analyzed the effects of the renewed Contracts on the delta smelt, and that

the renewal of the Contracts would not likely adversely affect the delta smelt and its critical habitat. Along with its request, Reclamation included information to supplement its 2004 and 2005 biological assessments regarding the impact of renewing the Contracts on the delta smelt, titled the "Supplemental Information to the Sacramento River Settlement Contractors Biological Assessment, Long-term Contract Renewal; and Supplemental Information to the Long Term Renewal of Water Service Contracts in the Delta-Mendota Canal Unit" (Supplemental Information). That Supplemental Information included an updated report titled "2015 Status of the Species and Status of Critical Habitat for the Delta Smelt *(Hypomesus transpacificus)*" (Status of the Species), which addressed the status of the delta smelt and its habitat.

In December 2015, FWS concluded this second-track consultation by issuing a letter of concurrence regarding the effects of renewing the Contracts on the delta smelt. The letter stated that "all of the possible effects to delta smelt and its critical habitat by operating the CVP to deliver water under the SRS and DMC contracts were addressed" in the 2008 OCAP biological opinion. The letter also stated that the 2008 biological opinion included an RPA to "avoid jeopardy to the delta smelt and adverse modification or destruction of its critical habitat associated with water deliveries under the contracts." FWS therefore concurred that renewing the Contracts would not jeopardize the delta smelt and amended its prior 2005 letters of concurrence (relating to Reclamation's renewal of the Contracts) to reference the 2008 OCAP biological opinion in place of the references to the invalidated 2004 and 2005 OCAP biological opinions.

C

In April 2016, NRDC filed its fourth amended complaint. Relevant here, NRDC's fourth claim for relief alleged that FWS violated the APA and ESA by failing to carry out an adequate consultation in response to Reclamation's second-track request regarding the effect of the renewal of the Contracts on the delta smelt. Specifically, it claimed that FWS impermissibly relied solely on the 2008 OCAP biological opinion in issuing its 2015 letter of concurrence. NRDC's second claim for relief alleged that Reclamation was arbitrary and capricious and violated section 7 of the ESA by executing and implementing the Contracts in reliance on FWS's allegedly faulty analysis.[6] Neither claim challenged the validity of FWS's 2008 OCAP biological opinion.

NRDC's fifth claim for relief alleged that Reclamation violated its duty under the ESA's implementing regulations to reinitiate consultation with NMFS over the implementation of the Settlement Contracts. Unlike the second and fourth claims for relief, NRDC's fifth claim did not challenge the adequacy of Reclamation's consultation prior to the renewal of the Settlement Contracts, and it did not challenge the validity of the executed Settlement Contracts. Rather, NRDC claimed that Reclamation retained sufficient discretion in the Settlement Contracts to

---

[6] In an October 2016 order, the district court dismissed NRDC's second claim for relief in part because NRDC failed to notify Reclamation of its claim in compliance with the ESA's 60-day notice requirement. *See Nat. Res. Def. Council v. Norton*, No. 105-cv-1207, 2016 WL 6135858, at *15 (E.D. Cal. Oct. 20, 2016); *see also* 16 U.S.C. § 1540(g)(2)(A)(i). NRDC then sent Reclamation a letter giving notice of the alleged violations and, after waiting 60 days, filed a fifth amended complaint, reasserting its second claim for relief.

take measures that would inure to the benefit of the Chinook salmon. Accordingly, it alleged that in light of new, post-contract information regarding the ecological effects to the Chinook salmon, Reclamation was required to reinitiate consultation with NMFS regarding the implementation of the Settlement Contracts.

In February 2017, the district court granted the Defendants' motion to dismiss with respect to NRDC's fifth claim for relief. *See Nat. Res. Def. Council v. Norton*, 236 F. Supp. 3d 1198, 1240 (E.D. Cal. 2017). It determined that, although NRDC had identified new information bearing on how the implementation of the Settlement Contracts may affect the Chinook salmon, the terms of the Settlement Contracts did not provide Reclamation with the discretion to implement those Contracts in a way that would benefit the Chinook salmon. *See id.* at 1211, 1218; 50 C.F.R. § 402.16. Therefore, the district court concluded, NRDC failed to state a claim that Reclamation violated the ESA and APA by not reinitiating consultation with NMFS.

In March 2018, NRDC filed its sixth amended complaint, which is the operative complaint for the second and fourth claims for relief. After the parties filed cross-motions for summary judgment, the district court, in a comprehensive memorandum decision and order, granted summary judgment on the second and fourth claims for relief in favor of the Defendants. *See Nat. Res. Def. Council v. Bernhardt*, No. 105-cv-01207, 2019 WL 937872, at *36 (E.D. Cal. Feb. 26, 2019). As to the fourth claim for relief, the district court determined that *Jewell* did not prohibit FWS from relying on its 2008 OCAP biological opinion in its informal consultation with respect to the renewal of the Contracts, *id.* at *15, that FWS properly did so, *id.* at *16–20, and that NRDC's arguments that FWS's 2015 letter of

concurrence was insufficient all failed, *id.* at \*22–34. Given that NRDC's second claim for relief against Reclamation was largely derivative of its fourth claim, and any non-derivative arguments lacked merit, the district court determined that it likewise failed. *Id.* at \*35–36.

NRDC now appeals the district court's rulings on its second, fourth, and fifth claims for relief. We review de novo both the district court's grant of summary judgment with respect to the second and fourth claims for relief, and its dismissal of the fifth claim for failure to state a claim. *See Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 920 (9th Cir. 2018); *Nat. Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*, 651 F.3d 1066, 1070 (9th Cir. 2011).

## III

Before turning to the merits, we address a threshold issue specific to the DMC Contracts challenged in NRDC's operative sixth amended complaint.

The DMC Contractors argue that NRDC's claims with respect to twelve of the DMC Contracts are moot. In 2020 and 2021 the DMC Contractors converted twelve of their water service contracts into repayment contracts pursuant to § 4011 of the Water Infrastructure Improvements for the Nation (WIIN) Act, Pub. L. No. 114-322, 130 Stat. 1628 (2016). The WIIN Act provides that "[u]pon request of the contractor, the Secretary of the Interior shall convert any water service contract in effect on the date of enactment of this subtitle and between the United States and a water users' association" to a "repayment contract[]." §§ 4011(a)(1), (a)(1)(A), 130 Stat. at 1878. According to the DMC Contractors, as a result of this conversion, the repayment contracts have superseded the DMC Contracts. The DMC

Contractors claim that the relief NRDC seeks (an injunction against performance of the DMC Contracts, and to require reinitiation of ESA consultation on the DMC Contracts) would be pointless because the repayment contracts, not the DMC Contracts, govern the United States's rights and obligations. Therefore, the DMC Contractors contend, the court cannot grant any effective relief relating to the superseded contracts, rendering NRDC's claims moot. In making this argument, the DMC Contractors rely on *Harrison Western Corp. v. United States*, which held that when the government signed a second contract covering the same subject matter as the original contract, without reserving any rights under the first contract, the government had abandoned the first contract and its claims under the first contract were moot. 792 F.2d 1391, 1393 (9th Cir. 1986).

We disagree. "A case is not moot if a federal court can grant the parties any effective relief." *Jewell*, 749 F.3d at 782. "The party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." *Id.* (cleaned up). The DMC Contractors have not carried this burden. If Reclamation entered into the DMC Contracts based on a defective ESA consultation, then any harm caused by this defect is continuing, since the DMC Contractors have not alleged that Reclamation engaged in a valid ESA consultation before the conversion. (NRDC, for its part, alleges that Reclamation did not engage in any ESA consultation at all.) Because the WIIN Act provides that the conversion of water service contracts into repayment contracts does "not modify other water service, repayment, exchange and transfer contractual rights between the water users' association, and the Bureau of Reclamation," § 4011(a)(4)(C), a repayment contract may be equivalent to a continuation of the water service contract, and therefore

distinct from the new, superseding contract we considered in
*Harrison Western Corp*. NRDC argues that under these
circumstances, a court could rescind the repayment contracts
or require FWS to initiate a consultation on these contracts
under its "broad discretion to fashion equitable remedies."
*Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon
Indians v. U.S. Dep't of Energy*in , 232 F.3d 1300, 1305 (9th
Cir. 2000). The DMC Contractors have not provided any
persuasive argument as to why NRDC would be unable to
obtain equitable relief in these circumstances. Therefore, the
DMC Contractors have not carried "the heavy burden of
establishing that there remains no effective relief a court can
provide." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853,
862 (9th Cir. 2017).

IV

We now turn to the merits. We begin with NRDC's
fourth claim for relief, which alleges that FWS violated the
APA by failing to conduct an adequate second-track
consultation on the effects of the Contract renewals on delta
smelt and its critical habitat. Specifically, the fourth claim
alleges that (1) FWS unreasonably relied on its 2008 OCAP
biological opinion as the basis for its 2015 letter of
concurrence, (2) FWS failed to use the best scientific and
commercial data available in making its determination,
(3) FWS impermissibly postponed its analysis of the impacts
of the Settlement Contract renewals on the delta smelt to an
unspecified future consultation, and (4) the 2015 letter of
concurrence was invalid because it failed to consider any
impacts of the contracts on delta smelt and its critical habitat
beyond 2030. We address these claims in turn.

A

We begin by considering NRDC's claim that in analyzing the effects of the Contract renewals on the delta smelt and its critical habitat, FWS was arbitrary and capricious in relying on its 2008 OCAP biological opinion. NRDC argues that FWS could not rely on its 2008 OCAP biological opinion in issuing its 2015 letter of concurrence because *Jewell* held that the 2008 biological opinion did not constitute a consultation regarding renewal of the Contracts. NRDC also contends that, assuming FWS could rely on the analysis in its 2008 OCAP biological opinion, the 2015 letter of concurrence did not adequately analyze the effects that Contract renewal would have on the delta smelt, and was therefore arbitrary and capricious.

We disagree. First, NRDC misunderstands the effect of FWS's two-track consultation approach and the nature of our conclusion in *Jewell*. *Jewell* addressed NRDC's claim that Reclamation failed to adequately consult with FWS before renewing the Contracts. It held that the issuance of the 2008 OCAP biological opinion did not moot NRDC's claim because the consultation on the OCAP "d[id] not represent a consultation with FWS concerning the impact of the Bureau's decision to renew the specific contracts" before the court in that case. *Jewell*, 749 F.3d at 782. *Jewell* noted that Reclamation had never reconsulted with FWS on the effects of renewing the Contracts. In rejecting the district court's determination that Reclamation had no obligation to engage in consultation on renewal of the Contracts, *Jewell* merely confirmed that Reclamation's first-track consultation could not take the place of a second-track consultation, and therefore the 2008 consultation on the OCAP could not replace Reclamation's consultation on the renewal of the Contracts. Reclamation corrected this error by engaging in

a second-track consultation on the renewal of the Contracts, resulting in the 2015 letter of concurrence now at issue. Nothing in *Jewell* indicates that FWS could not rely on the substance of the 2008 OCAP biological opinion in its second-track consultation. Therefore, *Jewell* has no bearing on FWS's decision to rely on the 2008 OCAP biological opinion in issuing its 2015 letter of concurrence.

Second, because FWS could rely on the 2008 OCAP biological opinion, FWS's analysis of the effects that Contract renewal would have on the delta smelt was not arbitrary or capricious. As noted above, consistent with its two-track approach, FWS historically relied on the first-track consultation to address the effects of water deliveries on the delta smelt, and the second-track consultation to consider other effects of contract renewal. At the time that Reclamation reinitiated consultation in 2015, FWS had already engaged in the second-track consultation on the renewal of the Contracts, which had resulted in the 2005 letters of concurrence that broadly addressed the environmental effects of the renewal of the Contracts. As is FWS's practice, the 2005 letters incorporated the then-current 2005 OCAP biological opinion which "addressed the effects of delivering CVP water for renewed long-term water contracts." The 2005 letters of concurrence thereupon concluded that renewal of the Contracts would not jeopardize the delta smelt or critical habitat.

As a result of the reinitiation of consultation in 2015, FWS revisited the history of its consultation process on the renewal of the Contracts. It determined that "Reclamation is not proposing any different contract terms for the [Contracts], or any change in operations to deliver water under the [Contracts]." Further, it concluded that "all of the possible effects to delta smelt and its critical habitat by

operating the CVP to deliver water under the [Contracts] were addressed in the 2008 [OCAP biological opinion]." That biological opinion "includes a reasonable and prudent alternative (RPA) to avoid jeopardy to the delta smelt and adverse modification or destruction of its critical habitat." In light of these conclusions, FWS amended the 2005 letters of concurrence to incorporate the 2008 OCAP biological opinion by reference, replacing the superseded 2004 and 2005 biological opinions. In doing so, FWS necessarily concluded that the 2005 letters of concurrence, amended to incorporate the 2008 OCAP biological opinion, considered all the environmental effects of the renewal of the Contracts, and established that renewal of the Contracts would not jeopardize the delta smelt or its critical habitat.

FWS adequately explained this decision. The 2015 letter of concurrence, in conjunction with the amended 2005 letters of concurrence, detailed all the environmental effects of the renewal of the contracts. The letters explained the consultation process, the history of the Contracts at issue, the delivery of water under the Contracts' terms, why the Contracts are necessary for CVP and SWP operations, and that the 2008 OCAP biological opinion concluded that renewal of the Contracts would not jeopardize the delta smelt with the implementation of the RPAs. Contrary to NRDC's assertions, FWS considered Reclamation's contractual obligations to deliver water, the existence of the Contracts' shortage provisions, the water rates and charges, and water conservation requirements.

In short, FWS's decision to incorporate by reference the 2008 OCAP biological opinion with respect to its conclusions on the delta smelt was not arbitrary and capricious. Rather, it was appropriate for FWS to tier off the 2008 OCAP biological opinion for the narrower consultation

regarding renewal of the Contracts.  Logically, because FWS properly determined in the 2008 OCAP biological opinion that the implementation of the renewed Contracts (with RPAs) would not jeopardize the delta smelt (a decision we have upheld, *see San Luis*, 747 F.3d 581), it was bound to conclude in its letters of concurrence that the renewal of the Contracts would not jeopardize the delta smelt.  Our standard of review in this context is "highly deferential" to the agency.  *Id.* at 601.  We conclude that such deference is appropriate here.  Therefore, we reject NRDC's argument that FWS erred in relying on the 2008 OCAP biological opinion in its 2015 letter of concurrence or that FWS failed to adequately analyze the effects that Contract renewal would have on the delta smelt.

## B

NRDC contends that FWS violated its obligations under the ESA by failing to ensure that its 2015 consultation was based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).  NRDC lists three sources of information that it claims FWS failed to consider properly. First, NRDC refers to a 2015 report by the Management, Analysis, and Synthesis Team operating within the Interagency Ecological Program for the San Francisco Bay/Delta Estuary, referred to as the MAST Report.  This report concluded that spring outflows have a positive impact on juvenile delta smelt abundance.  Second, NRDC references testimony provided by Reclamation to the State Water Board in 2010 that "[i]ncreased Delta inflows are needed to improve the quality and availability of habitat within the Delta."  Finally, NRDC cites data by a state fisheries agency showing that fall, spring, and summer surveys returned record-low catches in 2014 and 2015. According to NRDC, FWS erred by ignoring this data, all of

which was before it, and failing to address it in its 2015 concurrence.

The ESA requires that agencies "use the best scientific and commercial data available." *Id.* The purpose of this standard "is to prevent an agency from basing its action on speculation and surmise." *Locke*, 776 F.3d at 995 (citing *Bennett v. Spear*, 520 U.S. 154, 176 (1997)). The decision as to what constitutes "best available science" is one that "belongs to the agency's special expertise." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 791 (9th Cir. 2018) (cleaned up) (quoting *San Luis*, 747 F.3d at 602).

"When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Id.* (quoting *San Luis*, 747 F.3d at 602). Therefore, to succeed on a best-available-science claim, a plaintiff must not only identify relevant scientific evidence that the agency ignored, but show that it "is in some way better than the evidence [the agency] relies on." *Locke*, 776 F.3d at 995. And because a court may not "choose[] among scientific studies . . . and order[] the agency to explain every possible scientific uncertainty," *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc), *abrogated in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008), the plaintiff must show that any disregarded scientific evidence would materially affect the agency's conclusion. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) (plaintiff showed that agency failed to acknowledge scientific data that directly "contradicted" the agency's scientific conclusion); *cf. Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660 (9th Cir. 2009) (plaintiff must explain how the scientific evidence at issue "directly undermin[es]" the agency's conclusion.).

Contrary to NRDC's assertions, FWS's 2015 letter of concurrence did not ignore the new information identified by NRDC. When Reclamation requested informal consultation on Contract renewal in July 2015, it provided FWS with Supplemental Information, including the Status of the Species document. *See supra* at 25. The Status of the Species document discussed the data from the 2015 MAST Report, including data showing that spring outflow had a positive impact on delta smelt abundance.[7] The Supplemental Information also included information regarding recent population surveys from 2014 and 2015.

The penultimate paragraph of FWS's 2015 letter of concurrence addresses this new information showing a decline in delta smelt and the importance of increased outflows. In this paragraph, FWS cites the Supplemental Information and expresses FWS's concern about the decline of delta smelt "as demonstrated by the historically low numbers in all recent survey efforts," reflecting the information in the 2014 and 2015 surveys. The paragraph also notes that FWS may need "greater certainty as to Reclamation's ability to provide needed outflow through the Delta," and suggests that "[i]f increased outflows are needed and cannot be met under the SRS contracts, those contracts may need to be revisited to ensure consistency with the Act." This reflects the MAST Report's conclusion that spring outflows are important to juvenile delta smelt abundance.

---

[7] The parties dispute whether the substance of Reclamation's 2010 testimony to the State Water Board was covered by the MAST Report, and therefore included in the Supplemental Information. NRDC does not explain, however, how the 2010 testimony was material to FWS's decisionmaking.

FWS both acknowledged concerns based on new information and continued to rely on the 2008 OCAP biological opinion's conclusion that the coordinated operation of the CVP and SWP, with RPAs, would "avoid jeopardy to the delta smelt and adverse modification or destruction of its critical habitat associated with water deliveries under the contracts." Although FWS did not expressly state that there was no need to revisit this conclusion in light of the new evidence it acknowledged, we can reasonably discern FWS's path. *See Friends of Santa Clara River*, 887 F.3d at 925 n.17.

"The determination of what constitutes the best scientific data available belongs to the agency's special expertise and warrants substantial deference." *Id.* at 924 (cleaned up). FWS's reliance on its 2008 OCAP biological opinion, which considered the environmental impact that renewal of the Contracts would have in the context of CVP and SWP operations, is the sort of "scientific determination" to which we defer. *Native Ecosystems Council*, 883 F.3d at 791 (in light of "FWS's site-specific [biological opinion]," court deferred to agency's "expertise" over a peer-reviewed study allegedly showing "fatal[] inconsisten[cies]" with the agency action). NRDC does not show how the MAST Report and survey data it identifies, would materially affect the agency's conclusion, *Friends of Santa Clara River*, 887 F.3d at 925, or directly undermine FWS's conclusion in the 2008 OCAP biological opinion, *see Zinke*, 900 F.3d at 1068; *Castaneda*, 574 F.3d at 660. Merely pointing to new evidence and stating at a high level of generality that it was different from the evidence relied on by FWS, with no explanation of how it would materially affect FWS's analysis, is not enough. We therefore conclude that FWS did not fail to ensure that its 2015 consultation was based on

"the best scientific and commercial data available."   16 U.S.C. § 1536(a)(2).

For the same reason, we reject NRDC's argument that the penultimate paragraph in FWS's 2015 letter of concurrence shows that FWS improperly postponed considering the impacts of the Contract renewal.  That FWS expressed concerns about possible future issues affecting the delta smelt does not mean that FWS deferred its analysis.  Rather, the 2015 letter of concurrence, along with the amended 2005 letters of concurrence, constituted FWS's analysis that the execution of the renewed Contracts would not likely adversely affect the delta smelt and its critical habitat.  Finally, we also reject NRDC's argument that FWS failed to articulate a rational connection between its conclusion and the evidence before it.  FWS could rationally rely on its 2008 OCAP biological opinion's analysis of the environmental effects of the renewed Contracts in reaching its conclusion.

C

NRDC next argues that FWS acted arbitrarily and capriciously by relying on the 2008 OCAP biological opinion without accounting for intervening changes in environmental conditions.  According to NRDC, the environmental baseline changed because Reclamation sought and received permission from the State Water Board to deviate from the flow requirements for the Sacramento–San Joaquin Delta as set forth in D-1641 due to the drought in 2014 and 2015.  "Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action."  50 C.F.R. § 402.02.

NRDC's claim fails. FWS had considered Reclamation's Temporary Urgency Change Petitions in Reclamation's reinitiation of its first-track consultation regarding the 2008 OCAP biological opinion, and had concluded that "the resulting effects to Delta Smelt . . . appear to be within the range of effects previously analyzed in the 2008 [OCAP biological opinion]." FWS therefore concurred that the deviations would "result in no additional adverse effects on Delta Smelt or its critical habitat for [the various months at issue] beyond those previously analyzed in the 2008 [OCAP biological opinion]." We are at our "most deferential" when reviewing this type of scientific determination. *San Luis*, 747 F.3d at 592–93.

NRDC does not call into question FWS's determination that the 2008 OCAP biological opinion covered the effects of deviating from D-1641's flow requirements. Instead, NRDC argues that FWS did not revisit the issue in its 2015 letter of concurrence. This argument misses the point. Because the 2015 letter of concurrence relied on the 2008 OCAP biological opinion, which encompassed the effects of the purported deviations in the baseline, there was nothing more to explain beyond its rationale for relying on the 2008 OCAP biological opinion in the first place.

## D

Next, NRDC and the dissent, *see* Dissent at 61, argue that FWS was arbitrary and capricious in issuing the 2015 letter of concurrence because it failed to consider the effect of renewing the Settlement Contracts through 2045.[8]

---

[8] This challenge pertains only to the Settlement Contracts, as the DMC Contracts expire in 2030.

NRDC's argument requires some additional background. In preparing its 2008 OCAP biological opinion, FWS used "a computer simulation model known as CalSim II, developed jointly by [the California Department of Water Resources (DWR)] and Reclamation, to measure future operations." *San Luis*, 747 F.3d at 617 (capitalization altered). As explained in the 2008 OCAP biological opinion, "[t]he CalSim II model is a mathematical simulation model developed for statewide water planning," and is DWR's and Reclamation's "official SWP and CVP planning tool." The model simulates 82 years of hydrology for the Central Valley region, from 1922 to 2003, which is then used to "evaluate the performance of the CVP and SWP systems for: existing or future levels of land development, potential future facilities, and current or alternative operational policies and regulatory environments." In its first-track consultation, FWS used the CalSim II model to analyze future operational impacts of the CVP and SWP for a time period ending in 2030. NRDC argues that because the 2008 OCAP biological opinion considered the effects of the CVP and SWP operations only through 2030 (due to its reliance on the CalSim II model), FWS entirely failed to consider the effects of renewing the Settlement Contracts through 2045.

This argument fails because FWS's first-track consultation considered the full effect of the implementation of the renewed Settlement Contracts. A resource agency must "analyze the effect of the *entire* agency action." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988). Where the agency action is ongoing, the time period covered by the resource agency's analysis "must be long enough for [the resource agency] to make a meaningful determination as to whether the ongoing [agency action] 'reasonably would be expected . . . to reduce appreciably the likelihood of both

the survival and recovery'" of the listed species. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 523–24 (9th Cir. 2010) (emphasis omitted) (ellipsis in original) (quoting 50 C.F.R. § 402.02); *see also Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 739 (9th Cir. 2017). In *Turtle Island*, for instance, we upheld NMFS's decision to analyze the effects of an agency action on sea turtles over a 25-year period where the agency action was ongoing and the impacts on sea turtles would occur "over the next century." 878 F.3d at 739. We concluded that due to the "constraints in the available data supply," NMFS's choice of a 25-year analysis was not arbitrary and capricious. *Id.*

By contrast, if a proposed agency action consists of multiple distinct phases, the resource agency's consultation cannot be limited to a single phase of the entire action. *See Conner*, 848 F.2d at 1453. For example, in *Wild Fish*, FWS's definition of its action as the operation and management of a bull trout hatchery for a period of five years, and its issuance of a biological opinion that assessed only those five years, was impermissible where the bull trout hatchery had been "operating for seventy years and [was] expected to continue operating into the future." 628 F.3d at 522. The "artificial division of a continuing operation into short terms" threatened to "undermine" FWS's "ability to determine accurately the species' likelihood of survival and recovery." *Id.* Because the action was defined as spanning only five years, FWS's analysis of the environmental effects was not "long enough for [FWS] to make a meaningful determination as to whether the ongoing operation of the Hatchery 'reasonably would be expected . . . to reduce appreciably the likelihood'" of the survival and recovery of

the listed species. *Id.* at 523–24 (emphasis omitted) (ellipsis in original) (quoting 50 C.F.R. § 402.02).

Here, FWS's first-track consultation considered the full effects of the coordinated operation of the CVP and SWP. There is no dispute that this coordinated operation is an ongoing agency action that cannot be divided into distinct phases. The CalSim II model was merely one analytic tool used in FWS's first-track consultation. *See San Luis*, 747 F.3d at 617. The first-track consultation resulted in the 2008 OCAP biological opinion, which concluded that the entire ongoing CVP and SWP operations, including the implementation of the Settlement Contracts (with RPAs) for their full 40 years, would not jeopardize the delta smelt. Given that Reclamation has continuously supplied water to the Sacramento River Contractors since the 1960s (the original Settlement Contracts date back to 1964) under contracts with substantially identical terms and amounts, FWS properly considered the Settlement Contracts as part of this ongoing agency action rather than analyzing the Settlement Contracts in 40-year increments. Indeed, a segmented approach to analyzing the Settlement Contracts would have been contrary to *Wild Fish*, which held that analyzing only five years of an action that had lasted "for seventy years and [was] expected to continue operating into the future" was improper. 628 F.3d at 522. We upheld FWS's 2008 OCAP biological opinion and its use of CalSim II in full, notwithstanding the model's 2030 planning horizon. *San Luis*, 747 F.3d at 606.

In its second-track consultation regarding the renewal of the Settlement Contracts, FWS properly incorporated by reference the 2008 OCAP biological opinion. *See supra* at 33–34. In light of the biological opinion's conclusions that the Settlement Contracts would not jeopardize the delta

smelt during their 40-year term, FWS was bound to conclude in its 2015 letter of concurrence that the renewal of the Settlement Contracts would not jeopardize the delta smelt. *See id.* at 34. The underlying analytic tools used to develop the first-track 2008 OCAP biological opinion, including the CalSim II model and its planning horizon, do not affect this second-track conclusion. And because the 2008 OCAP biological opinion considered the entire 40-year term of the Settlement Contracts, FWS had a sufficient basis to make a "meaningful determination" in its second-track consultation that the renewal of the Settlement Contracts would not jeopardize the delta smelt, even though the CalSim II model used in the first-track consultation extended only to 2030. *Wild Fish*, 628 F.3d at 523–24. In short, we approved the use of the CalSim II model as part of the FWS first-track consultation, that consultation resulted in a conclusion that the effects of operating the CVP and SWP (which accounted for the implementation of the Settlement Contracts over their 40-year term) would not jeopardize delta smelt, and FWS properly relied on this conclusion in its second-track consultation to determine that the renewal of the Settlement Contracts would not jeopardize the delta smelt. In this context, the use of the CalSim II model as part of the first track-consultation did not constitute the "artificial division of a continuing operation into short terms" as in *Wild Fish. Id.* at 522.

In addition to relying on the 2008 OCAP biological opinion with respect to the delta smelt, FWS also considered other effects of the renewal of the Settlement Contracts for their entire 40-year term. Therefore, FWS's consultation on the renewal of the Settlement Contracts considered the full scope of the proposed action before determining that renewal

of those Contracts would not likely adversely affect the delta smelt.

## V

NRDC's second claim for relief relies on its contention that FWS's consultation resulting in the 2015 letter of concurrence was flawed, and therefore Reclamation violated its duties under the ESA by relying on it.

## A

Before turning to the merits of this claim, we address the Sacramento River Contractors' argument that NRDC's second claim for relief is barred because NRDC failed to give Reclamation 60 days' notice of this claim as required under the ESA.

The ESA provides that "[n]o action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A)(i). Providing such notice is a "'mandatory condition precedent to commencing suit' under the ESA," *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601 (9th Cir. 2014) (brackets omitted) (quoting *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989)), and the failure to do so "acts as an absolute bar to bringing suit under the ESA," *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998).

Here, after our decision in *Jewell* (which concerned NRDC's third amended complaint), the district court stayed the litigation, allowing Reclamation and FWS to engage in their 2015 consultation on the renewal of the Contracts. After the 2015 letter of concurrence issued, NRDC amended its complaint in April 2016. This fourth amended complaint

included new allegations pertaining to the second claim for relief, such as an allegation that Reclamation unlawfully relied on FWS's 2015 consultation. It also added the fourth, fifth, and sixth claims for relief. The district court dismissed NRDC's second claim for relief because some pre-2015 consultation allegations were moot, and because NRDC failed to comply with the ESA's 60-day notice requirement with respect to the allegations that were not moot. NRDC then sent Reclamation a notice of its claims. After 60 days passed, NRDC amended its complaint again to add its second claim against Reclamation.

The Sacramento River Contractors argue that NRDC did not comply with the 60-day notice requirement because NRDC merely amended its complaint instead of bringing an entire new "suit" after waiting 60 days. We disagree. We have held that the statutory language providing that "[n]o action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary," § 1540(g)(2)(A), does not require the plaintiff to file an entirely separate lawsuit after giving 60 days' notice, *Wild Rockies*, 772 F.3d at 602–03. Instead, a plaintiff can give the requisite 60-day notice and then amend a pending complaint to add ESA claims after the 60 days has elapsed. *Id.* Although in *Wild Rockies* the plaintiff's original complaint raised only non-ESA claims, our conclusion that commencing an action for purposes of § 1540(g)(2)(A) includes amending a pending lawsuit requires us to conclude that a plaintiff may also commence a new action raising claims under the ESA by amending a pending suit after giving 60 days' notice, even if the pending suit raised other ESA claims. By giving 60 days' notice to Reclamation of its claims, NRDC put Reclamation "on notice of a perceived violation of the statute" and provided Reclamation with "an

opportunity to review [its] actions and take corrective measures if warranted." *Wild Rockies*, 772 F.3d at 601 (citations omitted). NRDC therefore satisfied the ESA's notice requirement.

B

Turning to the merits, NRDC's second claim for relief alleges that Reclamation should have known that its consultation with FWS was inadequate, and therefore by executing and implementing the renewal Contracts, Reclamation failed to discharge its duty under the ESA to ensure that its actions would not jeopardize the continued existence of the delta smelt and its critical habitat. Further, NRDC argues, Reclamation violated its duty to consult by failing to inform FWS regarding the full scope of Reclamation's ability to negotiate different terms when renewing the Settlement Contracts or to refuse to renew those Contracts at all. Had Reclamation not misrepresented its authority, NRDC argues, FWS could have proposed RPAs that were more favorable to the delta smelt.

Neither of these arguments has merit. For the reasons stated above in section IV, Reclamation's consultation with FWS was not inadequate. FWS's 2015 letter of concurrence was not arbitrary and capricious, and therefore, Reclamation did not act arbitrarily and capriciously by relying on it. *See Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1265 (9th Cir. 2017) (because resource agency's biological opinion was valid, action agency permissibly relied on it).

We also reject NRDC's argument that Reclamation violated its obligations under the ESA by misinforming FWS regarding the scope of its discretion to negotiate the Settlement Contracts. In initiating consultation with FWS in 2015, Reclamation explained its view that relevant state law,

federal law, and the terms of its water rights permits limited its discretion in negotiating the terms of the Settlement Contracts. NRDC claims that these statements are untrue. But the accuracy of Reclamation's statements about the scope of its discretion is irrelevant to our analysis. In an ESA consultation, the resource agency must analyze the project as presented. There is no requirement that the action agency consider alternatives to its proposed action. Nor does the resource agency have an obligation to evaluate the action agency's claim that it lacks discretion to make changes to its proposed action. *See Sw. Ctr. for Biological Diversity*, 143 F.3d at 522–23.

In *Southwest Center*, for instance, an action agency rejected a draft RPA proposed by the resource agency for a project that would jeopardize a listed species. *Id.* at 518. The action agency claimed that it lacked the discretion to implement the RPA. *Id.* at 518, 522. When the resource agency subsequently proposed a revised RPA, an environmental group challenged this revision on the ground that (among other things) the resource agency had failed to independently review the action agency's representation that it lacked discretion to implement the environmental group's preferred RPA. *Id.* at 522. We rejected the plaintiff's argument, holding that the resource agency does not have "to pick the best alternative [RPA] or the one that would most effectively protect the [listed species] from jeopardy." *Id.* at 523. It was not significant that the resource agency rejected an RPA preferred by the environmental group "based on [the action agency's] bare assertion that it lacked the discretion" to implement that RPA. *Id.* The "only relevant question" was whether the resource agency "acted arbitrarily and capriciously or abused [its] discretion in adopting the final RPA." *Id.* Therefore, we held that the resource agency

"need only have adopted a final RPA which complied with the jeopardy standard and which could be implemented by the [action] agency." *Id.*

Here, as explained in the 2015 letter of concurrence, the 2008 OCAP biological opinion had analyzed the effects of the implementation of the renewed Contracts and provided RPAs that ensured the action would not jeopardize a listed species or critical habitat. The 2015 letter of concurrence incorporated the 2008 OCAP biological opinion by reference. Because FWS and Reclamation discharged their obligations under the ESA by establishing RPAs that "complied with the jeopardy standard and which could be implemented" by Reclamation, *id.*, the scope of Reclamation's discretion to negotiate the Contracts was irrelevant. Therefore, we affirm the district court's grant of summary judgment in favor of Reclamation on NRDC's second claim for relief.

## VI

We next turn to NRDC's fifth claim for relief, namely, that Reclamation unlawfully failed to reinitiate consultation with NMFS regarding the effect of continued implementation of the Settlement Contracts on the winter-run and spring-run Chinook salmon in light of new information about the alleged ecological effects of the parties' agreements. The Settlement Contracts were executed in 2005. According to the complaint, Reclamation violated the ESA by failing to reinitiate consultation on the contracts after: (1) NMFS issued a new biological opinion on the OCAP in 2009; (2) Reclamation released water during the 2014 and 2015 drought years which caused high Sacramento River temperatures and led to mortality of Chinook salmon; and (3) Reclamation obtained the State

Water Board's permission to deviate from D-1641 by increasing flows. As with FWS's 2008 OCAP biological opinion, *see supra* at 24, 38, NRDC alleged that NMFS's 2009 OCAP biological opinion relied on D-1641, and that Reclamation's filing of Temporary Urgency Change Petitions triggered its duty to reinitiate consultation. The district court dismissed this claim for failure to state a claim. We review a district court's grant of a motion to dismiss de novo. *See S. Coast Air Quality Mgmt. Dist.*, 651 F.3d at 1070.

## A

In determining whether Reclamation erred by failing to reinitiate consultation with NMFS, we must determine whether Reclamation retained some discretion to take measures that would "inure to the benefit of a protected species." *Turtle Island*, 340 F.3d at 974.

An agency has discretion to benefit listed species where it retains authority to negotiate contract terms. For example, in *Natural Resources Defense Council v. Houston*, we held that Reclamation had "discretion" to benefit a listed species where, during the contract renewal process, it could have negotiated to "alter . . . key terms in the contract" and "reduce the amount of water available for sale." 146 F.3d 1118, 1126 (9th Cir. 1998). But once the agency has entered into a legally binding agreement, it has such discretion only to the extent permitted by the agreement's terms. *See Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1082 (9th Cir. 2001) (*EPIC*). We explained this limitation in the context of an incidental take permit issued by FWS to a timber company. *Id.* at 1074–75. The permit authorized the timber company to take a limited number of northern spotted owls, but did not allow it to take other species. *Id.* at 1077.

After new species were listed as "threatened," the plaintiffs argued that FWS had an obligation to reinitiate consultation. We looked to the permit's language (including documents incorporated into the permit) to determine whether FWS retained discretion to take measures that would benefit the newly listed species. *Id.* at 1076–77, 1080–82. Because nothing in the permit did so, the plaintiff failed to state a claim that FWS unlawfully declined to reinitiate consultation. *Id.* at 1079.

The same limitation applies to an executed contract. *See id.* at 1082. Therefore, Reclamation retained discretion under the Settlement Contracts only to the extent the contracts themselves give it the power to "implement measures that inure to the benefit of the protected species." *Id.* at 1080 (emphasis omitted) (quoting *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995)).

B

Before turning to the merits of NRDC's claim, we first consider the government's argument that NRDC's reinitiation-of-consultation claim is barred by the statute of limitations. "Where, as here, a plaintiff alleges that an agency failed to comply with the ESA's procedural requirements, we apply the general six-year statute of limitations set forth in 28 U.S.C. § 2401(a)." *Ctr. for Biological Diversity v. Env't Prot. Agency*, 847 F.3d 1075, 1087 (9th Cir. 2017). The government argues that because NRDC claims that Reclamation's duty to reinitiate consultation arose from NMFS's issuance of its 2009 OCAP biological opinion, NRDC's claim accrued more than six years before the complaint was filed and therefore is time barred. But the new information contained in NMFS's 2009 OCAP biological opinion is not the only basis for NRDC's

claim. NRDC also contends that new information emerged in 2014 and 2015. To the extent NRDC alleges that this new information falling within the statute-of-limitations period "reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," 50 C.F.R. § 402.16(a)(2), NRDC's claim is not time barred.

C

We now turn to the question whether the Settlement Contracts give Reclamation the necessary discretion to "implement measures that inure to the benefit" of the Chinook salmon. *Sierra Club*, 65 F.3d at 1509. NRDC points to six different provisions in the Settlement Contracts that it claims gives Reclamation discretion to benefit the Chinook salmon through its diversion and releases of water, structuring its CVP operations, and enhancing cold water storage in the Shasta Reservoir. We consider each of these provisions in turn.

Article 7(b) of the Settlement Contracts provides: "The Contractor shall comply with requirements applicable to the Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution of this Settlement Contract undertaken pursuant to Section 7 of the Endangered Species Act of 1973, as amended, that are within the Contractor's legal authority to implement."[9] NRDC argues that this language in Article 7(b) means that if future consultations conclude that additional protections are needed to avoid jeopardy to a listed species, then

---

[9] The "Contractor" in the Settlement Contract refers to the specific Sacramento River Contractor who entered into the agreement with Reclamation.

Reclamation has the authority to depart from the terms of the Settlement Contracts to protect the species. This interpretation is not consistent with the text of the provision. Article 7(b) establishes the Sacramento River Contractors' legal obligation to comply with a biological opinion issued with respect to "the execution of the renewal of *this* Settlement Contract," meaning the very Settlement Contract that the Contractor is signing. On its face, Article 7(b) does not apply to any consultation other than one regarding the execution of the particular Settlement Contract in which it appears. By its terms, this language applies only to the Sacramento River Contractors and gives no authority to Reclamation. Because nothing in the language of Article 7(b) gives Reclamation discretion to deviate from the Contract's language and implement measures that inure to the benefit of the Chinook salmon in the event of future biological opinions, it does not help NRDC here.[10]

Second, NRDC invokes Article 3(i) of the Settlement Contract. Article 3(i) provides that "if there is a shortage of Project Water because of actions taken by the Contracting Officer to meet legal obligations then . . . no liability shall accrue against the United States . . . for any damage, direct or indirect, arising therefrom."[11] NRDC argues that Article 3(i) allows Reclamation to reduce the water it provides to the Settlement Contractors if necessary to meet legal obligations. But this provision does not give Reclamation

---

[10] In disagreeing with this conclusion, the dissent relies solely on FWS's interpretation of Article 7(b) instead of construing the actual text of Article 7(b). *See* Dissent at 66–67. FWS, however, is not a party to the Settlement Contracts, and we do not afford its interpretation any deference.

[11] The Settlement Contract defines "Contracting Officer" to mean the Secretary of the Interior or an authorized representative.

discretion to alter the Settlement Contract to benefit a listed species. Rather, this is a force majeure clause that limits Reclamation's liability for damages in the event legal obligations are imposed on Reclamation that require it to breach the Settlement Contracts by reducing the diversion of water. *See Jewell*, 749 F.3d at 783 (explaining that a similar shortage provision in the DMC Contracts "is permissive, and merely absolves the United States of liability if there is a water shortage resulting from, inter alia, 'actions taken . . . to meet legal obligations.'"). In other words, in a narrow circumstance in which Reclamation has *no* discretion to act—one in which it has to meet legal obligations—Article 3(i) shields it from liability for damages. The duty to comply with mandatory legal obligations is not a source of discretion. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) ("[Section] 7(a)(2)'s no-jeopardy duty covers only discretionary agency actions and does not attach to actions . . . that an agency is *required* by statute to undertake once certain specified triggering events have occurred.").[12]

Nor does Article 3(e) give Reclamation discretion to take measures that would inure to the benefit of the Chinook salmon. That provision states that "[n]o sale, transfer, exchange, or other disposal of any of the Contract Total . . . or the right to the use thereof . . . shall be made by the

---

[12] The dissent acknowledges that Article 3(i) merely "allows Reclamation to reduce the amount of Project Water supplied to Settlement Contractors to comply with federal laws such as the ESA," Dissent at 67, and fails to explain how such compliance with mandatory legal obligations can be a source of discretion to amend the terms of the Settlement Contract.

Contractor without first obtaining the written consent of the Contracting Officer."

NRDC argues that this language gives Reclamation discretionary authority over approving or conditioning the sales or transfers of water to the Settlement Contractors. But this authority is entirely reactive; the provision applies to Reclamation only to the extent the Contractor wishes to transfer water. Article 3(e) limits the ability of a Contractor to transfer water in a way contrary to law and without the consent of Reclamation. But it does not give Reclamation unilateral discretion to benefit the Chinook salmon.

Article 3(h) likewise gives Reclamation no discretion. That provision states that "[t]he United States assumes no responsibility for and neither it nor its officers, agents, or employees shall have any liability for or on account of," among other things, "[a]ny damage . . . caused by a shortage of water whether such shortage be on account of errors in operation, drought, or unavoidable causes." NRDC claims this provision allows Reclamation to reduce releases to avoid jeopardy to listed species. But again, this provision, like Article 3(i), simply limits Reclamation's liability. It does not allow Reclamation to alter the amount of water diverted at its discretion.

NRDC next cites Article 9(a). That provision states that "[d]uring the term of this Settlement Contract and any renewals thereof . . . [i]t shall constitute full agreement . . . as to the quantities of water . . . which may be diverted by the Contractor from its Source of Supply for beneficial use on the land." NRDC reads this reference to "beneficial use" as confirming Reclamation's continuing discretion to assess the reasonable beneficial use of the water it provides to the Settlement Contractors and to "make adjustments if

necessary." That reading is contrary to Article 9(a)'s plain language, which merely confirms that the Settlement Contract constitutes the full agreement regarding how much water may be diverted, and that the "diversion, use, and allocation [of water] shall not be disturbed so long as the Contractor shall fulfill all of its obligations." A provision that confirms the quantity and allocation of water to the Sacramento River Contractors under the Settlement Contract so long as they fulfill their obligations is not one that permits Reclamation to "make adjustments if necessary" in such quantity and allocation.

Article 30(b) similarly provides no discretion to Reclamation. It grants Reclamation the "right to make determinations necessary to administer [the] Settlement Contract[s] that are consistent with the provisions of [the] Settlement Contract[s], the laws of the United States and of the State of California, and the rules and regulations promulgated by the Secretary of the Interior." Those "determinations shall be made in consultation with the Contractor to the extent reasonably practicable." NRDC argues that this provision "confirms" that "Reclamation retains discretion" under other provisions in the Settlement Contracts, but does not argue that Article 30(b) alone gives Reclamation discretion. Because none of the provisions cited by NRDC provides such discretion, Article 30(b) does not help NRDC. Moreover, to the extent NRDC identifies this provision as permitting Reclamation to administer the Settlement Contracts consistent with state and federal law, it does not cite any specific laws that "authorize[]" "discretionary Federal involvement," 50 C.F.R. § 402.16, and, again, the requirement to comply with legal obligations upon a triggering event is not a source of discretion, *see Nat'l Ass'n of Home Builders*, 551 U.S. at 669.

Finally, NRDC goes beyond the terms of the Settlement Contracts and argues that federal and state laws require Reclamation to depart from contract terms as necessary to protect ESA-listed species. These legal requirements, NRDC argues, give Reclamation the requisite discretion necessary to trigger reinitiation of consultation with NMFS when it receives new information. Specifically, NRDC cites the CVPIA's requirement that the Secretary "administer all . . . contracts in conformance with the requirements" of the CVPIA, § 3404(c)(2), 106 Stat. at 4709, including the requirement that the Secretary "operate the Central Valley Project to meet all obligations under State and Federal law," such as the ESA, *id.* § 3406(b), 106 Stat. at 4714. NRDC also invokes California's "public trust doctrine" and the "background state law principle[] of reasonable and beneficial use" as sources of discretion.

This argument fails. To start, NRDC forfeited this argument by failing to develop it before the district court. *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998) ("We apply a general rule against entertaining arguments on appeal that were not presented or developed before the district court." (internal quotation marks and citation omitted)). But even if we reach this argument, it lacks merit, as it merely reiterates that Reclamation must comply with legal obligations, which is not a source of discretion. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 669.

Accordingly, we conclude that the renewed Settlement Contracts do not give Reclamation the discretion to take measures that would benefit the Chinooks salmon. Therefore, the district court did not err in dismissing NRDC's fifth claim for relief for failure to state a claim.

**AFFIRMED.**[13]

GOULD, Circuit Judge, concurring in part and dissenting in part:

At issue is the federal government's renewal of two sets of water contracts in California. NRDC[1] contends that the government's renewal of these contracts was invalid under the Endangered Species Act ("ESA"). The district court disagreed, entering judgment in favor of Defendants-Appellees on three of NRDC's claims under Rule 54(b).

The first set of contracts are the 40-year Sacramento River Settlement Contracts ("Settlement Contracts"), which provide water to unadjudicated senior water rights holders on the Sacramento River downstream from the Shasta Dam. The second set of contracts are the 30-year Delta-Mendota Canal Unit Contracts ("DMC Contracts"), which supply water from the Delta-Mendota Canal to contractors who did not claim senior water rights. The Bureau of Reclamation ("Reclamation") entered into these two sets of contracts and renewed both sets of contracts when they began to expire in the early 2000s.

---

[13] We grant NRDC's motions for judicial notice, Dkt. 33, 72, grant the DMC Contractors' motion for judicial notice, Dkt. 41, grant the Settlement Contractors' motion for judicial notice, Dkt. 48, and deny the Settlement Contractors' motion to strike, Dkt. 47.

[1] Plaintiffs-Appellants include Natural Resources Defense Council, San Francisco Baykeeper, Friends of the River, The Bay Institute, Winnemem Wintu Tribe, and Pacific Coast Federation of Fishermen's Association, Inc. Like the majority, I refer to Plaintiffs-Appellants collectively as "NRDC."

NRDC appeals the district court's rulings on three of its claims challenging Reclamation's renewal of the Settlement and DMC Contracts: the district court's grant of Defendants-Appellants' motion for summary judgment on NRDC's second and fourth claims for relief; and the district court's dismissal of NRDC's fifth claim for relief for failure to state a claim.  NRDC's fourth claim is that the concurrence of the Fish and Wildlife Service ("FWS") with Reclamation that the contract renewals would not jeopardize the delta smelt was arbitrary and capricious.  NRDC's second claim is that Reclamation violated its duties under the ESA by relying on FWS's concurrence.  NRDC's fifth claim is that because Reclamation retained some discretion in the Settlement Contracts, the ESA required Reclamation to reinitiate consultation with the National Marine Fisheries Service ("NMFS") regarding the Settlement Contracts in light of new information about the contracts' effect on winter-run and spring-run chinook salmon.

I concur in part in the majority opinion.  First, I agree with the majority that NRDC's claims are neither moot nor time barred.  Second, I agree with the majority that the district court's grant of summary judgment to Defendants-Appellees on NRDC's fourth claim, as to the DMC Contracts only, was proper because FWS's delta smelt consultation was not arbitrary or capricious as to the DMC Contracts.  Third, I agree with the majority that the district court's grant of summary judgment to Defendants-Appellees on NRDC's second claim was proper because Reclamation engaged in a valid consultation with FWS and did not misinform FWS about its discretion to negotiate the contracts.  Therefore, I concur in the court's affirmance of the district court's judgment on NRDC's fourth claim as to the DMC contracts and on NRDC's second claim.

However, I part ways with the majority opinion's resolution of two of NRDC's claims challenging the renewal of the Settlement Contracts.  Because FWS did not consider the effect of renewing the Settlement Contracts through 2045, the end of the renewed Settlement Contracts' term, I conclude that the district court erred in dismissing NRDC's fourth claim for relief as to the Settlement Contracts.  And because Reclamation retained some discretion under the Settlement Contracts such that the ESA required Reclamation to reinitiate consultation on the contracts' effects on chinook salmon, I also conclude that the district court erred in dismissing NRDC's fifth claim for relief.

In short, I would affirm the district court's order in part, reverse in part, and remand.  I therefore concur in part, and respectfully dissent in part, from the court's judgment.

## I.   Standards of Review

"We review *de novo* the district court's decision on cross motions for summary judgment." *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 965 (9th Cir. 2021) (quoting *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007)).  We must grant summary judgment where "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *see also Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (*en banc*) (citing *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007)).  In "a record review case, we may direct that summary judgment be granted to either party based upon our review of the administrative record." *Id.* (citing *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)).

We also review *de novo* the district court's dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Wilson v. Lynch*, 835 F.3d 1083, 1090 (9th Cir. 2016), *cert.*

*denied sub nom. Wilson v. Sessions*, 580 U.S. 1217 (2017). In evaluating whether a complaint states a plausible claim for relief, we accept the factual allegations of the complaint as true and construe the pleadings in the light most favorable to the plaintiff. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144–45 (9th Cir. 2021).

We review an agency's compliance with the ESA under the Administrative Procedure Act ("APA"). *Karuk Tribe*, 681 F.3d at 1017 (citing *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004)). We must determine whether the agency's action complies with the APA's requirements. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (quoting *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (*per curiam*)). We must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Under the deferential arbitrary-and-capricious standard, "the agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 994. Thus, we sustain agency actions when agencies "articulate[] a rational connection between the facts found and the conclusions made." *Id.* (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,* 426 F.3d 1082, 1090 (9th Cir. 2005)). Although we will not "substitute our own judgment for that of the agency, we must 'engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it.'" *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010) (quoting *Nat'l Wildlife*

*Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008)).

## II.  NRDC's Fourth Claim for Relief

NRDC's fourth claim for relief alleged that FWS's concurrence in Reclamation's renewal of the Settlement and DMC Contracts was arbitrary and capricious for a variety of reasons.  I agree with the majority that several of NRDC's proffered reasons are unavailing, specifically: (1) that FWS arbitrarily relied on the 2008 OCAP biological opinion, *see* Maj. Op. at 31–34; (2) that FWS's concurrence was not based on the best scientific and commercial data available, *see id.* at 34–38; and (3) that FWS did not account for intervening changes in environmental conditions, *see id.* at 38–39.

However, because FWS's computer simulation model only considered the impact of the Settlement Contracts through 2030, and not through the contracts' end-year of 2045, I conclude that FWS's concurrence as to the renewal of the Settlement Contracts was arbitrary and capricious.  By not considering the full life of the contracts, the agency was only considering part of the problem before it.

As we explained in *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988), and again in *Wild Fish Conservancy*, 628 F.3d at 521, defining the scope of the agency's action is a critical threshold inquiry in determining whether the agency complied with its duties under the ESA:

> [T]he scope of the agency action is crucial because the ESA requires the biological opinion to analyze the effect of the *entire* agency action.  We interpret the term agency action broadly, because caution can only be

> exercised if the agency takes a look at all the possible ramifications of the agency action.

*Wild Fish Conservancy*, 628 F.3d at 521 (quoting *Conner*, 848 F.2d at 1453) (internal citation and quotation marks omitted) (emphasis in original).    In both *Wild Fish Conservancy* and *Conner*, we held that the ESA consultation must look at a longer timeline than the duration of the act. In *Wild Fish Conservancy*, we held that the agency's decision to temporally limit its analysis was arbitrary and capricious, because shorter-term analyses "could mask the long-term impact" of an agency action.    628 F.3d at 523. And in *Conner*, we explained that "section 7 of the ESA on its face requires the FWS . . . to consider *all phases* of the agency action . . . in its biological opinion."    848 F.2d at 1453 (emphasis added).    We emphasized that "Congress, in enacting the ESA, did not create an exception to the statutory requirement of a comprehensive biological opinion" just because such analysis would burden the agency by requiring it "to make projections."  *Id.* at 1454.

The majority mistakenly categorizes Reclamation's renewal of the Settlement Contracts as an indeterminate, "ongoing" agency action regardless of the fact that the Settlement Contracts have a clearly defined 40-year term. *See* Maj. Op. at 40–43.  The majority's mistake stems from its conflation of (1) the overarching agency actions involved in the ongoing management of the CVP and SWP, and (2) the renewal of the Settlement Contracts.  Based on this mistake and relying on *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725 (9th Cir. 2017), the majority concludes that FWS's consideration of less than two-thirds of the Settlement Contracts' duration comported with the ESA's requirements. *See* Maj. Op. at 40–43.

*Turtle Island* is inapposite for two reasons. First, in *Turtle Island*, there was no time limit on the fishery's operation, so the agency was forced to choose a term of years in analyzing the fishery's impact. 878 F.3d at 739. In contrast, Reclamation renewed the Settlement Contracts for an explicit 40-year term, so the agency knew the temporal scope of the action but nevertheless considered less than two-thirds of that scope. While I agree that the agency was able to rely on an OCAP biological opinion in analyzing the renewed Settlement Contracts' impact on delta smelt, the biological opinion needed to comprehensively cover the scope of the contract renewal, as it did for the DMC Contracts. That the biological opinion did not account for the final fifteen years of the renewed Settlement Contracts makes it deficient as to those contracts under the ESA and our precedent. *Conner*, 848 F.2d at 1455 (refusing to "read into the ESA language to the effect that a federal agency may be excused . . . if, in its judgment, there is insufficient information available to complete a comprehensive opinion and it takes upon itself incremental-step consultation"). While the agency might rely on analysis from the ongoing management of the CVP and SWP, that overarching project management is not the agency action at issue; the agency action at issue here is the contract renewal, so whatever evidence the agency uses to justify its concurrence in the contract renewal must be comprehensive as to the contract renewal. Second, in *Turtle Island*, there was a lack of "available data." 878 F.3d at 739. However, a lack of available data is not the same as the agency's choice of a simulation model. That a more convenient computer model existed does not justify FWS's decision to rely on that model where the model did not consider the entire, defined scope of the contract renewal, and the government has not justified

its choice by showing that that computer model constituted the only "available data."

FWS should have considered, at minimum, the impact of the renewed Settlement Contracts on delta smelt during the contracts' entire term.    Our decisions in *Wild Fish Conservancy* and *Conner* require as much.  I would reverse the district court's holding on this issue and direct the district court to grant summary judgement in favor of NRDC. FWS's failure to consider the Settlement Contracts' impact on delta smelt for the entire, defined duration of those contracts was arbitrary and capricious.

## III.   NRDC's Fifth Claim for Relief

NRDC's fifth claim for relief alleged that Reclamation was required to reinitiate consultation on the effects of renewing the Settlement Contracts for winter-run and spring-run chinook salmon.    Considering the contractual language, NRDC stated a claim for relief because Reclamation had sufficient contractual discretion so that the ESA required Reclamation to reinitiate consultation with NMFS.

The ESA requires an action agency to reinitiate consultation "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2).   But agencies need to reinitiate consultation only "where discretionary Federal involvement or control over the action has been retained or is authorized by law." *Id.* § 402.16(a).  Reinitiation of consultation for the issuance of a permit or contract is required where the action agency "retain[s] sufficient discretionary involvement or control over [the] permit to 'implement measures that inure to the benefit of the'" species.  *Env't Prot. Info. Ctr. v.*

*Simpson Timber Co. ("EPIC")*, 255 F.3d 1073, 1080 (9th Cir. 2001) (quoting *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995)).

The district court, relying on our decision in *EPIC*, reasoned that Reclamation did not retain sufficient control because Reclamation did not have the power to "permit material revisions [to the terms of the contract] that might benefit the listed species in question."

In *EPIC*, FWS issued a contract to a logging company and conducted a Section 7 consultation for the spotted owl. 255 F.3d at 1076. The contract contained provisions to protect the spotted owl. *Id.* After the contract was executed, two additional species were added to the agency's threatened species list and plaintiffs sought to require FWS to reinitiate consultation on the already executed contract for the two newly listed species. *Id.* In rejecting this argument, we reasoned that "nowhere in the various permit documents did the FWS retain discretionary control to make new requirements to protect species that subsequently might be listed as endangered or threatened." *Id.* at 1081. In holding that the agency did not retain any discretion to protect the species in question, we stressed that none of the terms of the contract protected other species, only the spotted owl.

Our holding in *EPIC* required us to look to the terms of the contract to consider whether the agency needed to reinitiate consultation in light of new information. We look to the terms of the contract to determine whether the agency retains the power under the contract to "impose measures to protect" the species in question. *Id.* at 1082. In *EPIC*, we indicated that if the spotted owl, the original consultation species, were at issue, the case may have come out differently. *Id.* at 1081–82 (noting that the terms of the

contract permit remedies for breach of contract associated with the protection of spotted owls, but not the protection of other species not otherwise mentioned in the first consultation).

Under the contract here, I conclude that Reclamation can modify the terms of the contract, or even terminate the contract, if the ongoing contractual terms would jeopardize an endangered or threatened species such as chinook salmon. First, Reclamation has discretion to "revisit" the terms of the Settlement Contracts under Article 7(b) for the benefit of chinook salmon. Article 7(b) states:

> The Contractor shall comply with requirements applicable to the Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution of this Settlement Contract undertaken pursuant to Section 7 of the Endangered Species Act of 1973, as amended, that are within the Contractor's legal authority to implement.

FWS has interpreted this provision of the Settlement Contracts to mean that Reclamation may revisit the terms of the contracts. For example, in its 2015 delta smelt consultation, FWS said:

> [A]ny subsequent reinitiation of consultation on . . . the [Settlement] and DMC contract renewals would also be one "regarding the execution of the contract" and would, therefore, be subject to the terms of Article 7(b). In future consultations to ensure adequate protection of delta smelt and its

> critical habitat under the Act, we may require greater certainty as to Reclamation's ability to provide needed outflow through the Delta. If increased outflows are needed and cannot be met under the [Settlement] contracts, those contracts may need to be revisited to ensure consistency with the Act.

I agree that this provision of the Settlement Contracts allows Reclamation to amend the terms of the contracts under certain circumstances. For example, if upon consultation, NMFS makes a jeopardy finding, this provision requires Reclamation to change the terms of the contracts to comply with the RPAs.

NRDC also contends that Reclamation retains jurisdiction over the terms of the Settlement Contracts through Article 3(i), which allows Reclamation to reduce the amount of Project Water supplied to Settlement Contractors to comply with federal laws such as the ESA. Article 3(i) provides: "[I]f there is a shortage of Project Water because of actions taken by [Reclamation] to meet legal obligations, then . . . no liability shall accrue against the United States . . . for any damage, direct or indirect, arising therefrom." Defendants-Appellees contend that Article 3(i) only addresses the damages proximately caused if Reclamation breaches its contract, but it is implicit that there will be times when Reclamation will not be able to perform on its contract, so there are circumstances when the terms can be modified.

Based on these two provisions, I conclude that Reclamation retains "sufficient discretionary involvement" to modify the terms of the contracts and must reconsult regarding the changed impact of the contracts on chinook salmon. At stake here is the critical protection of endangered

or threatened species, and the controlling federal agency retains and requires discretion to accomplish this. Because NRDC stated a claim upon which relief could be granted under Rule 12(b)(6), I would reverse and remand to the district court for further proceedings.

## IV.   Conclusion

For the foregoing reasons, I would affirm in part, reverse in part, and remand to the district court for further proceedings. I concur in part, and respectfully dissent in part, from the court's judgment.